# United States Court of Appeals
## For the First Circuit

Nos. 05-2676, 05-2677, 05-2678

UNITED STATES OF AMERICA,

Appellee,

v.

NIGEL POTTER; DANIEL BUCCI;
and LPRI, LLC, f/k/a Burrillville Racing Association,
a/k/a Lincoln Park, a/k/a Lincoln Greyhound Park,
a/k/a Lincoln Park, Inc.,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya, Circuit Judge,

and Saris,[*] District Judge.

John A. MacFadyen with whom B. Jean Rosiello and MacFadyen,
Gescheidt & O'Brien were on brief for appellant Nigel Potter.
Anthony M. Traini for appellant Daniel Bucci.
John A. Tarantino with whom Patricia K. Rocha and Adler
Pollock & Sheehan P.C. were on brief for LPRI, LLC.

---

[*]Of the District of Massachusetts, sitting by designation.

Donald C. Lockhart, Assistant United States Attorney, with whom Robert Clark Corrente, United States Attorney, and Lee H. Vilker and Peter F. Neronha, Assistant United States Attorneys, were on consolidated brief for appellee.

_____

September 8, 2006

_____

**BOUDIN**, **Chief Judge**.   These are appeals by three defendants--two individuals, Daniel Bucci and Nigel Potter, and a business entity, LPRI, LLC ("Lincoln Park")--convicted after a jury trial of conspiracy to commit wire fraud and of multiple counts of wire fraud.  18 U.S.C. §§ 371, 1343, 1346 (2000).  The essence of the scheme charged by the government was to bribe the then-speaker of the Rhode Island House of Representatives, John Harwood, to influence state legislation in ways favorable to Lincoln Park.

Lincoln Park ran a gambling facility and dog track in Lincoln, Rhode Island.  The company was wholly owned by Denver-based Wembley USA which in turn was wholly owned by Wembley PLC of Great Britain.  Lincoln Park generated huge revenues (over $170 million in 2000), much of it from coinless slot machines, and after Wembley PLC's sale of another major asset in 1998-1999, Lincoln Park accounted for most of Wembley PLC's profits.

Bucci was general manager of Lincoln Park, responsible for its business strategy.  During the period in question, his direct superior was Francis Sherman, the president of Lincoln Park and of Wembley USA.  Potter was the chief executive officer of Wembley PLC.  Daniel McKinnon was a Rhode Island lawyer who represented Lincoln Park on zoning and other matters; Harwood was McKinnon's law firm partner.  Annual fees paid to McKinnon & Harwood prior to 2000 were in the range of $200,000 to $300,000.

On September 9, 2003, a federal grand jury indicted the three defendants for conspiracy to deprive Rhode Island citizens of their right to honest services and for individual counts of transmitting messages by wire communication in interstate and foreign commerce for purposes of executing this scheme. 18 U.S.C. §§ 371, 1343, 1346. The government's evidence, yet to be described, was intended to show that in 2000-2001 Bucci and Potter had plotted to pay McKinnon's law firm a very large sum in order to pay Harwood to shape legislation to assist Lincoln Park.

A first trial led to acquittals of the defendants on certain of the substantive wire-fraud counts but a hung jury on the conspiracy charge and on other substantive counts. In a second trial, all three defendants were convicted of the charged conspiracy; each defendant was convicted of two or more specific substantive counts and acquitted on others. The court sentenced Bucci to 41 months in prison, Potter to 36 months and Lincoln Park to a fine of $1.5 million.[1]

Sufficiency of the Evidence. The appeals now before us, by all three defendants, present issues relating to the convictions but none as to the sentences. We begin with challenges to the sufficiency of the evidence, reserving for later treatment one such

---

[1]In connection with various post-trial motions, the district court wrote opinions addressing, inter alia, the sufficiency of the evidence and alleged prosecutorial misconduct. United States v. Potter, 2005 U.S. Dist. LEXIS 21451 (D.R.I. Sept. 27, 2005); United States v. Potter, 2005 WL 2367627 (D.R.I. Sept. 27, 2005).

issue peculiar to Lincoln Park.  Because these sufficiency claims were preserved by motions for judgment of acquittal, review is de novo, United States v. Shea, 211 F.3d 658, 664 (1st Cir. 2000), cert. denied, 531 U.S. 1154 (2001).  The question is whether

> any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt.

United States v. Richard, 234 F.3d 763, 767 (1st Cir. 2000) (quoting United States v. Gabriele, 63 F.3d 61, 67 (1st Cir. 1995)).

The substantive offense is defined by 18 U.S.C. § 1343, which pertinently states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, . . . transmits . . . by means of wire . . . in interstate or foreign commerce, any writings, . . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned . . . .

The conspiracy offense consists of an agreement to do the same. Id. § 371.  As a result of a 1988 statutory amendment, a scheme to deprive citizens of their officials' honest services can fall within the statute if the necessary transmittal occurs (or, for a conspiracy, is agreed to).  Id. § 1346.

The government's evidence, based primarily on faxes and other company documents, showed that beginning in August 2000, Bucci began to press Potter to support a very large payment to

-5-

McKinnon because Lincoln Park had received benefits in "hundreds of millions of additional revenues" due to its "supporters" and would need additional support to advance its interests. Bucci said that, while no one had stated "that a quid pro quo is essential," "a wink is as good as a nod to a blind man" and that "we are represented by people who believe it is incumbent upon us to reflect gratitude."

Initially, the proposal was for a $1 million "performance bonus" to McKinnon. At an August 25, 2000, meeting of Wembley USA, Bucci supported the payment, while Sherman and David Brents, Wembley USA's chief financial officer, opposed it. Potter did not commit himself. In September, Bucci, Potter and Claes Hultman, chairman of the Wembley PLC board, had dinner with McKinnon. In early October, Bucci sent a fax to Sherman, which Potter later received, outlining Lincoln Park's political goals--such as authority for more lottery machines--and again proposing a large payment to McKinnon.

Potter then raised the issue with the Wembley PLC board on October 11, 2000, leading some members to question the propriety of such a payment. Later that month, at a Wembley USA meeting in Las Vegas, Sherman told Potter, according to Sherman's testimony, that such a payment would be "improper and illegal," and Brents omitted the item from Wembley USA's 2001 budget. Nevertheless, Bucci pursued the matter with Potter in a one-on-one meeting in

-6-

November.  Memorializing the meeting in a December 1, 2000, fax to Bucci, Potter wrote:

> Clearly most of the lobbying of the above will be done by yourself and other members of the Lincoln Park team.  We also agreed however, that Dan McKinnon was an unimportant element to the success of this strategy.  [The parties agreed that the intended word was "important."]  I suggested (following your requests for recognition of McKinnon's past contribution as well as further commitment) that we should pay McKinnon's law practice a 'retainer' of $500k in 2001 and 2002.  If the strategy is successful and extra machines (1000+) are implemented in 2002 we would consider increasing the retainer to $1m for each of 2003/2004/2005.  Similarly if no additional machines are achieved then the $500k p.a. for 2001 and 2002 would cease.

There followed a number of faxes between Potter and Bucci arguing about the details of the plan and making quite clear that the payments contemplated were intended to advance Lincoln Park's legislative agenda.  In an exchange of faxes on December 11 and 12, 2000, Potter stated:

> I am happy that the McKinnon payments are as we agreed when we met and which you reiterated in your note to me of last Friday, i.e. $500,000 a year in 2001 and 2002 followed by $1m a year for the next three years (or sooner if machines installed prior to 31/12/2002) subject to the receipt of permission to install at least 1,000 extra VLT or slot machines.

Sherman was not copied on most of these communications, Potter later testifying that under a new corporate reorganization plan, the responsibility for handling the matter would be Bucci's.

At a Wembley PLC board meeting in December 2000, a $600,000 retainer for McKinnon & Harwood was inserted at Potter's request into the 2001 Wembley USA budget. On January 18, 2001, Bucci faxed Potter an editorial from the Providence Journal that described Harwood as the "Ocean State emperor," a reference to Harwood's alleged vast influence in Rhode Island politics. In the margin of the article, Bucci wrote a comment emphasizing the article's description of Harwood's "power [and] influence."

Another Wembley USA meeting was held on January 24, 2001, and Sherman (according to his testimony) again complained about inappropriate payments. Brents testified that Potter told him and Sherman that the payments had been approved by the Wembley PLC board and were a "done deal." Sherman testified that, in response, he resigned as president of Lincoln Park, although he remained president of Wembley USA for several months. After a discussion with the company's accountants, a legal opinion as to the payment plan was sought; but no clearance was ever obtained.

After Potter was hospitalized in February 2001, Bucci pursued the payment plan with Hultman and another Wembley PLC director. This evidence, admitted only against Bucci, included further faxes charged as counts against Bucci, but it simplifies our discussion to focus on the evidence implicating all of the defendants. At trial Potter testified that he had made no final

commitment and had acted in good faith--evidence whose value was a matter for the jury.

In substance, the government's claim as to the conspiracy was that Potter and Bucci, no later than December 11-12, 2000, had agreed with each other to pay McKinnon a very large sum for the purpose of influencing Harwood improperly to use his authority as a state official to assist Lincoln Park in obtaining favorable legislation (and defeating unfavorable proposals). The first question is whether the jury could rationally have found that in fact such a conspiracy had been formed. See Richard, 234 F.3d at 767.

Harwood and McKinnon were partners; McKinnon, as the evidence makes clear, was not engaged primarily to perform ordinary lobbying services and had previously been paid only $200,000-$300,000 a year; by contrast, the much larger sums envisioned--ultimately $4 million--were explicitly aimed at achieving future legislation. We think a reasonable jury could infer that Potter and Bucci expected some of the money to reach Harwood--a partner in the firm--even if they did not know the precise way in which the money would reach him.

This inference of intended gain to Harwood is a matter of some importance. If McKinnon were merely a lobbyist with a golden touch and Harwood did not exist, a very large payment to McKinnon alone--contingent on results but without any intimation of intended

-8-

bribery or other wrongdoing--could not be said to aim at depriving the public of an official's honest services.  With the inference of intended payment to Harwood, a scheme to deprive is made out.

Much of the language used by the defendants about the expectations and identity of their unnamed "supporters" was vague, but this is hardly of help to them; one fax fills in the gaps left by another and the pattern permitted the jury to infer that Harwood was the real target.[2]  The evidence includes indirect or coded references to Harwood, descriptions of Harwood's power, and discussions of Harwood's past accomplishments.

Further, the indirect language supports the inference of concealment or deceit, which is a necessary part of a "scheme or artifice to defraud."  See United States v. Sawyer, 239 F.3d 31, 41 (1st Cir. 2001) ("Sawyer II").  The evidence of conspiracy and concealment went well beyond the use of cryptic language and included evidence of Potter and Bucci's concealment of the plan or of critical details of it from both Sherman and the Wembley PLC board.  This element, at least, was not remotely a close call.

Defendants argue that in this instance a final agreement on such a scheme never occurred.  In particular, relying upon

---

[2]The defendants argue that United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977), prohibited the district court from considering the conditionally admitted faxes between the individual defendants in its Rule 29 determination because a definitive Petrozziello finding occurs only at the end of the case.  The argument is mistaken: if Petrozziello is satisfied on the evidence available when the government rests, then the evidence is properly considered by the judge at this stage.

various qualifications in his faxes and other documents, Potter argues that he never definitively agreed to have the company pay large sums to McKinnon; rather, he describes his actions as preliminary and contingent, possibly even dependent on further assurances as to its lawfulness. The jury, however, could rationally reach the opposite conclusion.

If there was an agreement covertly to compensate Harwood for using his office to assist Lincoln Park in obtaining legislation, it could hardly be disputed that interstate faxes were to be used in executing the scheme; this was a major means of communication between Potter and Bucci. And, for the substantive counts, which identified specific faxes as violations, the same scheme or artifice would satisfy the predicate "devised or intending to device" requirement of the statute.

Attacking both the evidence and the indictment, the defendants say that there is no evidence that Harwood was a party to any agreement or even knew of the scheme. Admittedly, some honest services fraud decisions assume that one of the parties to such a scheme will be a public official;[3] but it is hard to find any considered holding that this is essential. Neither the language nor the policy of the wire-fraud statute suggests such a

---

[3]See United States v. Gray, 790 F.2d 1290, 1295 (6th Cir. 1986); United States v. Alexander, 741 F.2d 962, 964 (7th Cir. 1984), overruled on other grounds, United States v. Ginsburg, 773 F.2d 798 (7th Cir. 1985); United States v. Kaye, 593 F. Supp. 193, 196 (N.D. Ill. 1984); United States v. Freedman, 568 F. Supp. 450, 453-56 (N.D. Ill. 1983).

requirement.  See United States v. Sawyer, 878 F. Supp. 279, 289 (D. Mass. 1995), vacated on other grounds by 85 F.3d 713 (1st Cir. 1996); United States v. Yonan, 622 F. Supp. 721, 731-32 (N.D. Ill. 1985).

Certainly Harwood himself could not be convicted without proof of his knowing participation; but under the statute anyone could concoct a scheme to deprive Rhode Island citizens of Harwood's honest services and could send a fax for the purpose of executing such a scheme.  Similarly, two persons could conspire to devise the scheme and to use faxes for purposes of executing the scheme.  That Harwood might prove unwilling or unable to perform, or that the scheme never achieved its intended end, would not preclude conviction for either the substantive offense (sending the fax) or forming the conspiracy.

The statute also requires that the message be for the purpose of "executing" the scheme.  Juxtaposing "executing" with "devised or intending to devise" a scheme, see 18 U.S.C. § 1343, the defendants argue that the faxes they sent could at most relate to the devising (rather than the executing) of the scheme.  True enough, much of the faxing concerns whether such payments are necessary at all, what form they should take, and similar details that the defendants say were at most preliminary to execution.[4]

---

[4]Bucci and Potter also say that they differed on and never settled certain of the details; but the central agreement to make the payment can constitute the conspiracy without regard to whether some details were unsettled.  United States v. Sanchez, 917 F.2d

However, this argument depends on whether the term "executing" is construed narrowly and whether some sharp division exists between devising and executing schemes. In our view, the statute requires no strict sequence of exclusive phases: a faxed document that aims to settle the amount to be paid for illicit conduct can be part of the devising of a scheme and also sent "for the purpose of executing" the scheme. We have found little direct precedent but words and policy support this view.

To execute is to "perform or complete," Black's Law Dictionary 609 (8th ed. 2004); but the statute does not require that the scheme be "executed" or that the fax be directed to the last step of the scheme. A scheme, after all, may comprise a series of steps and any one of them integral to the scheme can be part of the execution. What is necessary is that the fax be sent "for the purpose" of fostering that execution. See, e.g., United States v. Luongo, 11 F.3d 7, 8-9 (1st Cir. 1993).

The defendants say that a narrow construction of "executing" is required; there is some case law suggesting the opposite. See, e.g., United States v. Silvano, 812 F.2d 754, 760 (1st Cir. 1987); accord Jed S. Rakoff, The Federal Mail Fraud Statute (Part I), 18 Duq. L. Rev. 771 (1980). It is enough here that the term executing, if used in its ordinary sense, includes the various steps in the execution and is not limited to the very

607, 610 (1st Cir. 1990), cert. denied, 499 U.S. 977 (1991).

-12-

last one.[5]  This alone answers the defendants' claim that the statute as applied did not give them fair warning of the elements of the offense.

Even if the defendants expected the payments to benefit Harwood, defendants say that there was no direct evidence that such payments were for a specific legislative act, such as a vote by Harwood; the government stipulated that Harwood, presumably because of his partner's normal work for Lincoln Park, had recused himself from voting on matters that might affect the company.  The government, say the defendants, never proved that they sought to have Harwood misuse his <u>official power</u> and thereby deprive the state's citizens of his honest services.

It is common knowledge that powerful legislative leaders are not dependent on their own votes to make things happen.  The honest services that a legislator owes to citizens fairly include his informal and behind-the-scenes influence on legislation.  There was adequate evidence, if any was needed beyond the size of the payment, that Bucci and Potter both believed Harwood to be powerful.  And <u>Sawyer II</u>, 239 F.3d at 40 n.8, forecloses any argument that the government must prove the specific official act targeted by the defendants.

---

[5]Certain instructions tendered by the defendants which the trial judge refused to give were thus not proper because their premise was that the law does create a rigid division between devising and executing.  Indeed, if the judge had been called upon to instruct in detail on the relationship, the instruction would likely not have been to the defendants' advantage.

We have held that favors, such as lunches, golf games, and sports tickets, may be modest enough and sufficiently disconnected from any inferable improper quid pro quo that a factfinder might conclude that only business friendship was at work, or at least nothing more than a warm welcome was being sought by the favor giver. See United States v. Sawyer, 85 F.3d 713, 728-29 (1st Cir. 1996) ("Sawyer I").  The line between permissible courting and improper use of gifts to obtain behind-the-scenes influence by an official is not always an easy one to draw, but one draws close at one's peril.

Given the sum involved in this case, its contingent character and the link to specific legislative ends, a jury could easily have found that this was a heartland quid pro quo case. Indeed, as we will explain in due course in relation to instructions, a reasonable jury could hardly find otherwise.  Thus the predicates for the conspiracy conviction exist; the defendants do not make detailed separate claims addressed to the individual faxes.

Defendants cite a couple of cases to suggest that other courts have held that the kind of conduct involved in this case did not involve a contemplated theft of honest services, but these cases are distinguishable.  For example, United States v. Rabbitt, 583 F.2d 1014 (8th Cir. 1978), cert. denied, 439 U.S. 1116 (1979), involved only payments to a third party for introductions to

decision makers, and <u>United States</u> v. <u>McNeive</u>, 536 F.2d 1245 (8th Cir. 1976), was a case of gratuities rather than quid pro quo bribery. See also <u>Sawyer I</u>, 85 F.3d at 725 (discussing these cases). None of the cases cited involves conduct of the kind proved here.

<u>Jury Instructions</u>. The next set of arguments by defendants is directed to the instructions. Broadly speaking, the instructions must give the jury an accurate picture of the pertinent law (<u>e.g.</u>, elements of the offense, defenses colorably presented by the evidence); the trial judge enjoys latitude in phrasing and emphasis; objections must be preserved subject to plain error (just as preserved objections are subject to harmless error); and, if a tendered instruction is itself inaccurate, it need not be given.[6]

The defendants' most important claim is that the district court should have given instructions crystalizing the distinction just touched upon: between forbidden efforts to deprive the public of honest services and permissible efforts--so far as the fraud statutes are concerned--merely to express friendship and assure a warm welcome. The defendants asked the district judge to give instructions, paraphrasing language mandated by us in <u>Sawyer I</u>, to tell the jury what would <u>not</u> be a theft of honest services.

---

[6]<u>Jones</u> v. <u>United States</u>, 527 U.S. 373, 388-90 (1999); <u>United States</u> v. <u>Prigmore</u>, 243 F.3d 1, 17 (1st Cir. 2001); <u>United States</u> v. <u>Gamache</u>, 156 F.3d 1, 9 (1st Cir. 1998).

In *Sawyer I*, the lobbyist had provided gifts of some value (sports tickets, trips, meals) to certain legislators, but there was mixed evidence as to what was sought in exchange. Because in *Sawyer I* these activities could easily have been viewed as distasteful, and were arguably illegal under state anti-gratuity laws, see *Sawyer I*, 85 F.3d at 727-32, the jury could have believed that cultivating a business friendship by means of gifts was itself honest services fraud. We said that the jury should be told that the latter was not honest services fraud. Id. at 727-29, 732, 741.

So far as proposed instructions sought a paraphrase of this proposition, the short answer is that this prosecution did not present the risk posed in *Sawyer I*. The defendants perhaps had colorable arguments for a jury on other issues (e.g., that the scheme had never become sufficiently concrete). But if the jury agreed that a matured scheme existed, aimed at providing millions of dollars in which Harwood would share, no jury could rationally believe that this was merely to cultivate friendship.

Thus, the *Sawyer* instruction was not required. That an instruction sought may be an accurate legal proposition does not make it relevant. This is obvious in cases where a defendant seeks an instruction on an affirmative defense like entrapment; the judge is entitled to refuse if the evidence does not make this a colorable claim for the jury. See, e.g., *United States* v. *Sanchez-Berrios*, 424 F.3d 65, 76-77 (1st Cir. 2005), cert. denied sub nom.,

-16-

<u>Cruz-Pagan</u> v. <u>United States</u>, 126 S. Ct. 1105 (2006).  Here, the principle is the same: what the jury is to be given is the law pertinent to the case before it.

In two other instructions, the defense sought to have the jury told that it was not unlawful merely to hire a lawyer whose partner is a member of the legislature even if the client has business in the legislature nor honest services fraud to violate conflict of interest or ethics laws.  In the context of this case, the government's case rested on no such theory, nor was there any likelihood that jury might convict on such a theory.  Again, the instructions were unnecessary.

Similarly, another instruction proposed by the defendants closely tracks language from <u>Sawyer I</u> stating that if "the 'scheme' does not, as its necessary outcome, deprive the public of honest services, then independent evidence of the intent to deprive another of those services must be presented."  85 F.3d at 725.  Again, this was required by the weaker facts in <u>Sawyer I</u>.  Here, by contrast, if the defendants schemed to pay millions of dollars, some of which would go to Harwood in exchange for various legislative acts, the necessary outcome (if the scheme worked) would be to defraud the citizens of Rhode Island.

Finally, defendants asked that the jury be told that "it is not enough . . . that a defendant intended to make a payment as a reward for past services or in order to ensure future services."

-17-

The former proposition might or might not be true depending upon context; a payment that had been promised in advance but paid afterwards could be unlawful. In any event the latter proposition is patently too broad and disqualifies the instruction in question.[7]

Potter also argues that the jury should have been instructed that withdrawal is a defense to conspiracy. His basis for the requested instruction was evidence that, in late January 2001, Potter contacted an attorney seeking advice as to whether the proposal payment was lawful. Withdrawal is a demanding defense requiring affirmative evidence of an effort to defeat or disavow or confess, United States v. Munoz, 36 F.3d 1229, 1234 (1st Cir. 1994), cert. denied, 513 U.S. 1179 (1995), and Potter's evidence proved nothing of the kind.

Rulings on Evidence. Certain evidentiary rulings by the district judge are challenged on appeal. The first claim, primarily by Potter, grew out of evidence that Potter, in the January 24, 2001, meeting in Las Vegas, said that the Wembley PLC board had approved the payment to McKinnon. Reviewing the minutes of the Las Vegas meeting, Potter added the phrase "in principle" to

---

[7]In Sawyer I, we said that a gratuity for an act already taken or planned by the legislator was not, absent an intended causal connection, a theft of honest services. 85 F.3d at 730; see also United States v. Mariano, 983 F.2d 1150, 1159 (1st Cir. 1993). By contrast, the term "ensure" in the proposed instruction suggests a causal connection and yet seeks exculpation.

the word "approval." The jury was shown the minutes and Potter was allowed to testify as to what he intended by the addition.

What the court did not allow was Potter's attempt then to offer two faxes from him to Bucci in which he used the phrase "in principle" together with further language in the faxes indicating that Potter was using the phrase "in principle" to mean something short of unqualified or unconditional approval. The government argued that "in principle" in the minutes spoke for itself and that the faxes were irrelevant.

The faxes were not irrelevant. They arguably had some tendency to show that Potter sometimes used the phrase "in principle" to mean less than unqualified approval; this is how many people use the phrase anyway, but Potter had a special interest in softening any evidence of his approval. The district judge did not explain her ruling; she probably thought that the other faxes--not directed to the Wembley PLC approval--were more confusing than enlightening.

The latter judgment would be reviewable only for abuse of discretion, United States v. Perez-Ruiz, 353 F.3d 1, 10 (1st Cir. 2003), cert. denied, 541 U.S. 1005 (2004), but, even if we deemed it mistaken (and we make no such ruling), there is no realistic possibility that exclusion of the faxes altered the outcome of the case. The phrase "in principle," mildly helpful to Potter with or without a separate gloss, was contained in the admitted minutes;

and he was allowed to elaborate from the stand on what he meant. The excluded documents would have added very little.

In his brief, Potter says that in English business argot, approval "in principle" was not approval at all but merely a green light for a proposer to renew his request. Potter could have so testified, but he did not, and the faxes do not support such a view. While the government doubtless stressed the "approval" language, its claim that Potter had effectively signed on to the payment scheme rested on a succession of events involving Potter and not on one document.

The defendants also claim that the district court erred in refusing to admit into evidence three contracts between Lincoln Park and Alan Goldman, a Rhode Island attorney who had provided political consulting and lobbying services for Lincoln Park in the early 1990s. Having successfully achieved results for the company, Goldman renegotiated his previous two contracts, leading to a third contract paying him $1 million for his past work.

Potter was allowed to testify to these events, obviously hoping to support the contention that the payment to McKinnon was for past work or, alternatively, that large payments contingent on legislative outcomes were not uncommon. However, the district court refused to allow the contracts themselves to be offered in evidence once Potter conceded that he had not earlier seen the contracts or even had their specific terms described to him.

If Potter did not see the contracts, it is hard to see how they were relevant to his state of mind; and it is also debatable whether the contracts, even assuming away authentication and hearsay issues, were proper evidence of ordinary practice in Rhode Island--being at most a single datum. Anyway, as Potter had testified to the key terms (which the government did not dispute), it is hard to see what the contractual detail would have added--and Potter offers no explanation.

The whole Goldman episode was of marginal importance. The evidence in this case showed that the proposed payments to McKinnon were patently linked to future performance and were not merely a renegotiated award for past service. And, while the Goldman contracts also contemplated payment for results, there is no evidence that they involved indirect payments to a legislator. The district court's compromise--testimony but no documents--was just the kind of judgment that Rule 403 leaves to the trial judge. E.g., United States v. Cunan, 152 F.3d 29, 36 (1st Cir. 1998).

Potter, in an argument adopted by Bucci, offers a separate claim of error addressed to the government's evidence. The trial court admitted some pieces of government evidence for limited purposes (e.g., against one defendant but not another or to show knowledge or intent but not for the truth of the matter asserted). Although the district court gave such limiting rulings as evidence came in, it refused at the close of the case to give

-21-

the jury a separate list of items admitted only for limited purposes.

The defendants say that despite the presumption that the jury follows the court's directions, United States v. Smith, 46 F.3d 1223, 1229 n.2 (1st Cir.), cert. denied, 516 U.S. 864 (1995), and the court's wide discretion in matters of this kind, United States v. Moreno, 991 F.2d 943, 947 (1st Cir.), cert. denied, 510 U.S. 971 (1993), the jury needed the help of a list in its deliberations. They argue that the present case was unusual because of the length of the trial, number of exhibits and variety of limitations.

Judged by such numbers, the trial was not unusually complex: there were 11 days of testimony, 54 exhibits from the government and several others from the defense, and conventional limits on permissible use were imposed on a number of the exhibits but by no means all. Major drug cases are often far lengthier and far more complicated. Nevertheless, just how great a threat of misunderstanding existed depends upon specific evidence and issues more than on numbers alone.

Here, the defendants quite properly do point to a couple of specific examples--presumably their best examples--of evidence that they say the jury may well have overvalued. Two of the items--exhibits concerning Harwood's alleged power--are quite important. The first was a newspaper editorial proclaiming Harwood the "Ocean

State emperor" and expressing the view that Harwood through secret backroom deals managed the legislature. This was sent by Bucci to Potter and admitted for state of mind but not for truth (for the latter purpose it was mere hearsay).

The defendants now complain that the limitation on use may have been ignored, noting that the government itself referred to Harwood in closing as the Ocean State emperor. But all that mattered for the crimes charged was whether the defendants <u>believed</u> that Harwood possessed such power. See <u>Yonan</u>, 622 F. Supp. at 731. The document, in context, was some evidence that they did so believe (Bucci sent it to persuade Potter of Harwood's importance), and their actions then confirmed that they so believed.

If defendants formed such a scheme and took such actions, it would not matter if their belief as to Harwood's power were mistaken. A plot to purchase drugs is unlawful even if the supposed supplier turns out to be a government agent. <u>E.g.</u>, <u>United States</u> v. <u>Giry</u>, 818 F.2d 120, 126 (1st Cir.), <u>cert. denied</u>, 484 U.S. 855 (1987). No impossibility defense was offered nor could one have succeeded on the present facts. <u>United States</u> v. <u>Pierce</u>, 224 F.3d 158, 166 (2d Cir. 2000), is inapposite, for it presents an issue of legal impossibility whereas the defendants in this case now press a claim of factual impossibility. See <u>United States</u> v. <u>Ames Sintering Co.</u>, 927 F.2d 232, 235-36 (6th Cir. 1990).[8]

_____

[8]In part for this reason, the defendants' proposed instruction stating that it was lawful for them to pay McKinnon any amount so

-23-

The other document was a fax from Bucci to Potter placing Harwood at the top of the hierarchy of legislators concerned with the state budget. The document was admitted only against Bucci and yet the government's reference to it in closing could have been taken to use the document against Potter as well. But Potter's counsel made no timely objection directed to this arguable misstatement; and this fax was a much milder version of the Ocean State emperor fax properly admitted against Potter.

No substantial trial is likely to be without minor errors or close judgment calls that might better have been made otherwise. Cumulative effect is relevant; but so is trial judge latitude, failures to object, and the overall strength of the government's case. See United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993), cert. denied, 512 U.S. 1223 (1994); Moreno, 991 F.2d at 947. Just how and in what terms to tell the jury (again) about evidence earlier admitted for limited purposes is not the subject of strict rules. We see neither an abuse of discretion nor any resulting miscarriage of justice in what occurred here.

Alleged Misconduct. Next, the defendants claim as error the district court's denial of their motion for a new trial. The substantive claim is that a new trial was required because of allegedly improper and prejudicial remarks by the prosecutor in

---

long as Harwood "did not vote [on matters] or do any official acts" relating to the defendants was an incorrect statement of the law; the relevant question is whether the defendants intended for Harwood to perform such acts.

-24-

closing arguments to the jury. Although refusal to grant a new trial is reviewed for "manifest abuse of discretion," United States v. Mooney, 315 F.3d 54, 59 (1st Cir. 2002), specific wrongful remarks can be challenged under conventional standards, which depend principally on whether a claim of error was preserved.

If a specific remark was improper and a timely objection was made, the issue is usually whether (taking account of any curative instruction) it likely affected the trial's outcome, Mooney, 315 F.3d at 61; deliberate misconduct may be viewed more harshly. United States v. Balsam, 203 F.3d 72, 87 n.19 (1st Cir.), cert. denied, 531 U.S. 852 (2000). Absent a timely objection, the test is for plain error under the familiar four-part test of United States v. Olano, 507 U.S. 725, 732-35 (1993).

Defendants allege that nine different statements by the prosecutor were improper. We focus first on the one rather lengthy passage which the government concedes to have been improper in one important particular. In his rebuttal argument, the prosecutor stated the following:

> I also want to mention just briefly what the case is not about. It is not about who is not charged. It is not about what is not charged. It is not about, well, what didn't the Government bring in. It's not about what didn't the Government tell you. It is not about one line in one exhibit, one line in another exhibit.
>
> It's not about any of that. Why? Because, as the Court will instruct you, your job is to decide this case on the evidence,

-25-

the evidence you've heard in this courtroom, and that's all, according to the law as the Court provides it.

If something's missing, if something isn't perfect, blame me. The Government's not perfect. I'm not perfect. Maybe it could have been done better. Maybe there could have been something that I could have given you, brought in here. Maybe I could have brought something in that the Court would have allowed in that didn't come in.

I brought you the evidence as we have it. I put if before you, and that's what you have to work with, that and what the defense put on and what the Court instructs you about. And in that regard, I want to discuss a couple of pieces of the evidence, just a couple.

Following the close of the rebuttal, the defendants moved for a mistrial and got instead a cautionary instruction:

In the course of his rebuttal testimony, Mr. Moore indicated and said something along the lines of that perhaps there was some additional evidence he might have been able to bring or that the Court would have allowed for your consideration.

It is not something that you should take into account at all, and I'm asking you at this time to disregard those comments completely.

On appeal, the government agrees that the prosecutor's remarks were improper so far as they suggested--primarily in the next-to-last paragraph--that the government might have other evidence that it did not offer because the prosecutor was not perfect. The government says that no timely objection was offered and anyway the comments did not alter the outcome of the case.

Our recent decisions have reserved the issue of precisely when objections must be made to closing statements to preserve the objection for ordinary review.[9]  Circumstances vary (the nature of the objection, problems of repetition and cumulative effect) as may the relief sought; whether a single rule would serve might be debated.  Since the issue has not been fully briefed and does not affect the result in this case, we follow the practice of United States v. Laboy-Delgado, 84 F.3d 22, 31 n.7 (1st Cir. 1996), and assume for present purposes that the objection was adequately preserved by the mistrial motion.

Turning to substance, a clear and deliberate reference in closing to supposedly favorable evidence that the government says it possesses but did not offer at trial is one of the worst sins a prosecutor can commit; and the effect may be just as bad even though the jury is left to guess at the content.  See United States v. Manning, 23 F.3d 570, 572-75 (1st Cir. 1994).  This may be so even though a cautionary instruction is given--everything depends on context, e.g., whether specific evidence was described (such an instruction may be more likely to be effective where no specific evidence is described), the timing and force of the cautionary instruction, and the like.

---

[9]United States v. Laboy-Delgado, 84 F.3d 22, 31 n.7 (1st Cir. 1996); United States v. Wihbey, 75 F.3d 761, 771 (1st Cir. 1996). Compare United States v. Mandelbaum, 803 F.2d 42, 44 n.1 (1st Cir. 1986), with Sepulveda, 15 F.3d at 1186-87.

However, in this case, the prosecutor's mistake, although real, was neither blatant nor seemingly calculated. The defense in closing stressed lack of evidence--importantly, lack of proof of Harwood's power and what specifically he could do to advance legislation in favor of Lincoln Park. This explains how the prosecutor got into the subject of arguing that the case was not about "what didn't the Government bring in."

The prosecutor's two references to other evidence that might exist (both qualified as "maybe") are something less than an avowal of the existence of other evidence; and the very next sentence says in substance that the government has no other evidence: "I brought you the evidence as we have it." Nor need we ignore the fact that the prosecutor's main theme in the quoted remarks was that the jury should decide the case on "the evidence you've heard in this courtroom."

This would be a very easy call if, as often happens, the evidence were such as to guarantee a conviction. See, e.g., Mooney, 315 F.3d at 60-61. Contrary to the defendants' claim that the case was very close, we think that the evidence amply supports the verdict. But the jury at the first trial hung and we can imagine how any jury might be led to entertain doubts in this case (e.g., as to whether the plot got far enough) even though the doubts might not be of much force from a strictly legal standpoint.

Nevertheless, we are confident that the outcome was not changed by the two sentences of the prosecutor that are the heart of the error. Given their vagueness, the prosecutor's own qualifications (that the case should be decided on the evidence and that the government had given all it had) and the cautionary instruction from the judge, this is not a case where the sentences had any substantial chance--let alone a likelihood--of changing the outcome. See generally Balsam, 203 F.3d at 87.

Defendants fairly argue that we should consider this improper comment not alone but together with any other significant errors in the prosecutor's closing. We have examined each of the other errors alleged--to only one of which a timely objection was made. In a couple of instances, there was nothing wrong with the statement; in others, the prosecutor may arguably have misstated evidence or could be taken to have asserted personal views or otherwise erred.

The timely objection was to the prosecutor's statement in rebuttal that Potter had never told the attorney (who was asked by Wembley PLC to provide a legal opinion) that the payment was in exchange for legislation raising the number of machines. The district court in its post-trial opinion adequately explains why the defendants are not persuasive in arguing that this claim misstated the evidence. United States v. Potter, 2005 WL 2367627, at *7 (D.R.I. Sept. 27, 2005).

As for the other claims, most involve errors (if they were errors at all) that were marginal on the facts of this case (e.g., the implied claims of personal knowledge). A misstatement of the evidence by the prosecutor did occur, but the district court reasonably found that it was not harmful, Potter, 2005 WL 2367627, at *7. All in all, unpreserved claims have to approach a miscarriage of justice before they warrant reversal. Olano, 507 U.S. at 732-35. Taking all of the claims made here together, nothing like that occurred in this case.

Corporate Liability. This brings us to a quite different issue, involving both instructions and evidence, which concerns the liability of Lincoln Park as a corporation. Lincoln Park says on appeal that its judgment of acquittal motion should have been granted. It points out that Sherman, president of Lincoln Park, told Bucci not to pay McKinnon any supplemental amount and that the district judge's own instructions appeared to make this a defense.

In her post-trial decision, the district judge correctly ruled that a corporation may be held liable for "the criminal acts of its agents" so long as those agents are acting within the scope of employment. United States v. Potter, 2005 U.S. Dist. LEXIS 21451, at *36 (D.R.I. Sept. 27, 2005); accord United States v. Cincotta, 689 F.2d 238, 241 (1st Cir.), cert. denied, 459 U.S. 991 (1982). The test is whether the agent is "performing acts of the

kind which he is authorized to perform," and those acts are "motivated--at least in part--by an intent to benefit the corporation." Cincotta, 689 F.2d at 241-42.

In this case, the evidence amply confirmed the district court's statement that "Bucci, as General Manager of Lincoln Park, assumed primary responsibility for maintaining relationships with political figures" in an effort to achieve the company's political goals. Potter, 2005 U.S. Dist. LEXIS 21451, at *37. As Potter confirmed, Bucci "led the whole lobbying effort in Rhode Island." The evidence, summarized above, also showed that Bucci led the effort to make the payments to McKinnon's firm, advocating for them at every stage.

Lincoln Park's brief on appeal concentrates almost entirely upon Sherman's testimony, the truth of which is not disputed, that he told Bucci not to make such payments. This, Lincoln Park argues, shows that the payment plan was not authorized. Further, it says that this testimony dovetailed with the district court's jury instructions that a corporation is not liable for acts that the corporation "in good faith" has forbidden or those that it "tries to prevent."

The legal rules for imputing criminal responsibility to corporations are built upon analogous rules for civil liability. For obvious practical reasons, the scope of employment test does not require specific directives from the board or president for

every corporate action; it is enough that the type of conduct (making contracts, driving the delivery truck) is authorized. See United States v. Beusch, 596 F.2d 871, 877-78 (9th Cir. 1979).

The case law has rejected arguments that the corporation can avoid liability by adopting abstract rules that no agent can make an unlawful price-fixing contract or no driver exceed the speed limit. United States v. Automated Med. Labs., Inc., 770 F.2d 399, 406 & n.5 (4th Cir. 1985); United States v. Basic Constr. Co., 711 F.2d 570, 573 (4th Cir.), cert. denied, 464 U.S. 956 (1983). Even a specific directive to an agent or employee or honest efforts to police such rules do not automatically free the company for the wrongful acts of agents. Thus,

> The principal is held liable for acts done on his account by a general agent which are incidental to or customarily a part of a transaction which the agent has been authorized to perform. And this is the case, even though it is established fact that the act was forbidden by the principal.

H. Reuschlein & Gregory, The Law of Agency and Partnership 167 (1990) (footnote omitted).[10]

There is admittedly a gray area. The restrictions, although not mechanically exculpatory of corporate liability, may well bear upon what is or is not within the scope of the agent's

---

[10]The Restatement (Second) of Agency explains by way of illustration: P directs the salesman in selling guns, never to insert a cartridge while exhibiting a gun. A, a salesman, does so. This act is within the scope of employment. Restatement (Second) of Agency § 230, illus. 1 (1958) (forbidden acts).

duties.  See generally Basic Constr., 711 F.2d at 572; Beusch, 596
F.2d at 878.  Such fine distinctions are of no moment here:
despite the instructions Bucci remained the high-ranking official
centrally responsible for lobbying efforts and his misdeeds in that
effort made the corporation liable even if he overstepped those
instructions.

The district judge went too far in the above-quoted
instruction in seeming automatically to preclude liability for
actions that the company forbade or tried to prevent, but the
instruction--being overly favorable to the company--was a harmless
mistake.  The mistake might be of concern if the overstatement
distracted the jury from its task.  But the district court did give
a proper instruction on scope of employment, and the over-favorable
addendum was obviously ignored or found irrelevant on the facts.

Further, on the present evidence a reasonable jury could
not have avoided holding the corporation liable once Bucci was
found to have committed the offenses.  Although a court may not
direct a verdict for the government in a criminal jury case, Rose
v. Clark, 478 U.S. 570, 578 (1986), the harmless error doctrine,
where it applies, may rescue a jury verdict despite deficiencies in
instructions--save for a small class of so-called structural
errors.  Neder v. United States, 527 U.S. 1, 8-15 (1999).

We are thus spared any need to pursue a different and
potentially difficult question as to how far actions of Potter

might themselves bear upon Lincoln Park's liability for Bucci's acts.  Potter, while higher than Sherman in the inter-corporate hierarchy, was not an officer of Lincoln Park--although the government makes something of his presence on the Lincoln Park board.  Such conundrums can be addressed in a case where they might alter the outcome.

Our discussion has addressed the most prominent arguable claims; other claims raised by defendants, including the claim that they should have been granted a new trial based on the weight of the evidence, have been considered but do not warrant discussion. The trial was well conducted and the outcome is not a surprise. The able appellate briefs by counsel on both sides are appreciated.

<u>Affirmed</u>.