UNITED STATES of America,
Plaintiff,

v.

Jorge DE CASTRO FONT
[1], Defendant.

Criminal No. 08–337 (FAB).

United States District Court,
D. Puerto Rico.

Jan. 15, 2009.

394

Lydia Lizarribar–Buxo, Lizarribar Masini Law Office, Joseph A. Eloucher–Martinez, San Juan, PR, for Dependant.

Juan A. Marques–Diaz, McConnell Valdes, Leslie Yvette, Flores–Rodriguez, McConnell Valdes, Luis Berrios–Amadeo, Cancio, Nadal, Rivera & Diaz, San Juan, PR, for Interested Parties.

Daniel A. Schwager, Mathew L. Stennes, United States Department of Justice Public Integrity Section, Washington, DC, Ernesto G. Lopez–Soltero, Timothy R. Henwood, United States Attorneys Office, District of Puerto Rico, San Juan, PR, Jacqueline D. Novas–Debien, US Attorney's Office, District of Puerto Rico, Hato Rey, PR, for Plaintiff.

## MEMORANDUM AND ORDER

FRANCISCO A. BESOSA, District Judge.

On January 2, 2009 defendant Jorge De Castro–Font ("De Castro") filed a motion requesting both that the Court suppress certain Title III wire intercepts and that the Court order a *Franks* hearing. (Docket No. 151) On January 8, 2009, the United States ("government") opposed De Castro's motion. (Docket No. 159) For the reasons provided below, the Court **DENIES** De Castro's two-pronged request.

### Discussion

#### Necessity requirement of 18 U.S.C. § 2518(1)(c)

Pursuant to Title III (of the Omnibus Crime Control and Safe Streets Act of 1968) a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c); *United States v. Hoffman*, 832 F.2d 1299, 1306 (1st Cir. 1987). This provision, also known as the necessity requirement, *see, e.g., United*

*States v. Santana*, 342 F.3d 60, 65 (1st Cir.2003); *United States v. Lopez*, 300 F.3d 46, 52–53 (1st Cir.2002), was "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). To satisfy this requirement the statement supporting the wiretap application "must demonstrate that the government has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." *Santana*, 342 F.3d at 65 (quoting *United States v. London*, 66 F.3d 1227, 1237 (1st Cir.1995) (quoting *Hoffman*, 832 F.2d at 1306–07)). The statement need not show, however, that the government exhausted all investigative procedures, nor must the government "run outlandish risks" prior to seeking a wiretap. *Hoffman*, 832 F.2d at 1306. The statement suffices "if it satisfies the burden that it indicate a 'reasonable likelihood' that alternative techniques would fail to expose the crime." *United States v. Ashley*, 876 F.2d 1069, 1073 (1st Cir.1989) (quoting *United States v. Abou–Saada*, 785 F.2d 1, 12 (1st Cir.), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986)).

De Castro contends that Special Agent Ruben Marchand–Morales's ("Marchand") affidavits offered in support of the July 2, 2008 and August 7, 2008 wiretap applications fail to show that investigative procedures less intrusive than a wiretap would not work. In fact, De Castro argues that the affidavits themselves show that the government already had sufficient information that it gathered from a confidential source identified as "CS1" to complete the investigation, thus obviating the need to resort to intercepting De Castro's telephone calls. (Docket No. 151, p. 8) As a corollary to this argument, De Castro asserts that the affidavits and the applications themselves are pretextual because subsequent to filing the applications the government relied only upon information it received from CS1 to request a search warrant (a method of investigation which the government claimed would be insufficient to develop its investigation of De Castro fully). The Court finds De Castro's argument meritless because Agent Marchand's affidavits explained in detailed, non-conclusory terms why some less intrusive means of investigation had already proven insufficient and why others were unlikely to succeed if attempted.

Agent Marchand's affidavits described several alternative investigative techniques that had already been attempted and failed to provide the government with important information: the communications between De Castro and other persons who were part of the investigation. Specifically, Agent Marchand explained that the government had already conducted physical surveillance, had interviewed cooperating persons, had utilized confidential sources, had analyzed pen register and toll record information, and had convened a grand jury to [subpoena] financial records and obtain other information. The utilization of these investigatory methods produced the information that Agent Marchand used to request the wiretaps. These methods revealed that De Castro was in communication with the individuals who were part of the investigation, and that these individuals provided payments, often in cash, to individuals working for De Castro. The methods utilized also provided indirect evidence that the payments were provided in exchange for political favors. These investigatory methods did not, however, make the government privy to the communication between De Castro and the other individuals who were part of the investigation. This information was necessary for

the government to know the true nature of the exchanges between De Castro and those other individuals.

CS1, the source that De Castro suggests provided sufficient information for the entire indictment against him, did not participate in meetings or phonecalls between De Castro and other individuals. Even if CS1 had been privy to some of these communications, the information from other confidential sources indicated that there were other suspicious transactions that did not involve CS1. Clearly, CS1 could not have provided the government with information related to transactions that did not involve him/her. If the government had relied solely upon CS1 and the other confidential sources, then it would have left significant stones unturned in terms of the scope of illegal activity in which De Castro was allegedly involved. Nor could the government have obtained this information via other investigatory methods less intrusive of privacy.

As Agent Marchand explained, other investigatory methods less intrusive of privacy than a wiretap that had not yet been attempted at the time of the wiretap applications were unlikely to produce the information that was being sought. The government considered and rejected the use of undercover agents, the search of De Castro's trash ("trash runs"), and the execution of a search warrant. Agent Marchand explained that for an undercover agent to aid in the investigation, the agent would have to pose as someone willing to purchase a political favor, and to do that the agent would need to establish an "undercover business" with a credible history that would not arouse suspicion in De Castro. This task would be exceedingly difficult given De Castro's familiarity with the business, political and legal community in Puerto Rico. Even if successful, it would also only provide information from that

one undercover agent's interactions with De Castro; it would not provide information as to De Castro's interactions with other individuals. As for the trash runs, they would be difficult to carry out without arousing the suspicion of De Castro and others because De Castro resides in a high security condominium and he worked in the Capitol. This is also true for search warrants which, once acted upon, would alert De Castro and others to the ongoing investigation. Moreover, as Agent Marchand explained, the payments that had been detected were usually made in plain, unmarked envelopes and the funds contained in the envelopes were distributed the same day that they were received. As detailed in Agent Marchand's affidavit, De Castro also communicated with other individuals via phone or in person, rather than in writing or via some other medium that might have been discoverable during a search of De Castro's office or home. Even though the government ultimately sought and obtained a search warrant, as noted by De Castro, the ultimate use of a search warrant in this case does not invalidate Agent Marchand's argument that a search warrant [issued earlier in the investigation] would tip off De Castro and other possible conspirators to the existence of the investigation. Nor does it prove that at the time the applications were made that it was likely that a search warrant would have revealed the nature of the discussions between De Castro and other persons, the primary information sought in the wiretaps.

■ Lastly, the information sought via wiretap is of unique relevance to the first twenty counts filed against De Castro. *C.f., Ashley,* 876 F.2d at 1072–73 ("The authorizing court is also not precluded from referring to the nature of the alleged crimes in its evaluation of the sufficiency of the affidavit as to the required showing

of antecedent efforts.") To commit honest services wire fraud, an individual must make use of the wires. Prior to the wiretap, the government had evidence from the pen register analysis that De Castro used his phones to talk with other individuals, but the government did not know the subject of the conversations. Presumably, De Castro's use of his own phones to communicate with others may have been unrelated to the alleged criminal activity involving De Castro and those persons. Because (as discussed above) no other less intrusive form of investigation appeared likely to reveal the subject matter of the wire communications, the government properly demonstrated the need for the wiretaps to determine whether the wires were utilized to further the suspected fraud.

Thus, for the reasons explained above, the Court affirms that Agent Marchand's affidavits provided a sufficient explanation for why traditional (or non-wiretap) investigative techniques would not suffice to expose the extent of the alleged criminal activity in this case. Therefore, the Court **DENIES** De Castro's challenge to the affidavits under Title III's necessity requirement, 18 U.S.C. § 2518(1)(c).

### Franks Hearing

■ Where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in a warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). This is known as a *Franks* hearing. *See, e.g., United States v. Adams,* 305 F.3d 30, 36 n. 1 (1st Cir.2002). "There is, of course, a presumption of validity with respect to the affidavit supporting [a] search warrant."

*Franks,* 438 U.S. at 171, 98 S.Ct. 2674. To obtain an evidentiary hearing, a challenger must accompany allegations of deliberate falsehood or of reckless disregard for the truth with an offer of proof. *Id.* Affidavits, sworn statements, or otherwise reliable witness statements should support the challenge, or the absence of such support should be satisfactorily explained. *Id.* "Mere inaccuracies, even negligent ones, are not enough." *Adams,* 305 F.3d at 36 n. 1.

■ De Castro claims that he is entitled to a *Franks* hearing because Agent Marchand mistakenly attributed more power to De Castro than he actually had as Chairman of the Senate's Rules and Calendar Committee. Agent Marchand stated that De Castro, as Chairman of the Rules and Calendar Committee, "prepares the working calendars of the Senate. He supervises the work of the Committees, and decides which legislation will and will not be considered by the full Senate." (Misc. No. 08–094(FAB), Docket No. 5, Aff't. p. 6, ¶ 8A) De Castro understands this to mean that he alone controlled which bills would appear before the full Senate. He asserts that in reality he "followed the orders of Senate President Kenneth McClintock and executed the mandates of the 'Autenticos' Caucus and 'the new majority.'" (Docket No. 151, pp. 2–3) Although De Castro correctly met the procedural requirement of *Franks* by supporting his challenge with a statement submitted under penalty of perjury, his challenge fails both the first and second substantive prongs of *Franks;* De Castro neither shows that the affiant acted knowingly and intentionally or with reckless disregard for the truth by inserting the challenged portion of the affidavit into the affidavit, nor does he show that without the suggestion that De Castro controls the Senate's calendar the affidavit fails to support a finding of probable cause.

De Castro asserts that the challenged portion of the affidavit is false; in other words, he claims that despite holding the Chairmanship of the Rules and Calendar Committee, De Castro did not decide what legislation to forward on to the full Senate. Furthermore, it is debatable whether the challenged portion of the affidavit did not say that De Castro exclusively or single-handedly decided what bills to forward to the Senate. Nonetheless, De Castro's only statement regarding what Agent Marchand knew, or should have known, is that "[t]his information was readily available and verifiable by the Federal Bureau of Investigations through the Caucus Minutes, the notes of the Caucus Secretary or interviews with Senate employees knowledgeable on those subjects." (Docket No. 151, p. 3) Agent Marchand's presumed mistake does not rise to the level of reckless disregard for the truth let alone knowing and intentional inclusion of a falsehood.

Although the concept of reckless disregard of the truth cannot be encompassed in one infallible definition, it has been described as acting with a high degree of awareness of probable falsity or as acting while entertaining serious doubts as to the truth. *See Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (discussing reckless disregard in the context of a defamation claim). De Castro does not suggest that Agent Marchand had any awareness of the probable falsity of the challenged statement or that he had any doubts as to its truth (let alone serious doubts).

In its opposition brief the government clarified that in concluding that it was De Castro who decided what legislation would be considered by the full Senate, Agent Marchand actually relied on De Castro's own recorded statements. In essence, De Castro has claimed that it was he who controlled the Senate's calendar. In recorded meetings on May 29, 2008 and June 18, 2008 he states that he controls, or at the very least may manipulate, which bills and designations reach the full Senate. (Docket No. 159, pp. 4–5) The irony of the incongruence between De Castro's recorded statements and his statement under penalty of perjury is not lost on this Court. Perhaps in the recorded statements De Castro exaggerated his influence; perhaps his statements are all bluster. Whatever the explanation, however, Agent Marchand cannot be faulted for accepting as true De Castro's own statements as to his degree of influence over the Senate's agenda.

█ Even if the Court were to find that the government failed the first prong of the *Franks* test, the Court would still hold that De Castro is not entitled to a hearing. The absence of the portion of the affidavit stating that De Castro decides which bills come before the full Senate does not sap the remaining portions of the affidavit of probable cause. De Castro seems to take the logical leap that if he did not decide what bills go before the full Senate then he would be unable to promote the agenda of those who allegedly paid him for political favors. De Castro provides no explanation for this leap of logic nor does he cite any law supporting it. It is not the situation that a Senator may only commit honest services wire fraud if he or she controls the agenda of the Senate. As the government noted, "[i]t is common knowledge that powerful legislative leaders are not dependent on their own votes to make things happen. The honest services that a legislator owes to citizens fairly include his informal and behind-the-scenes influence on legislation." *United States v. Potter,* 463 F.3d 9, 18 (1st Cir.2006). Also, De Castro's focus on *quid pro quo* is misplaced; that is not a required element of an honest services wire

399

fraud charge. *Id.* The remaining portions of Agent Marchand's affidavit provide more than sufficient evidence for the inference that others, such as confidential source 2, provided De Castro payments in exchange for his political support.

Accordingly, the Court **DENIES** De Castro's request for a *Franks* hearing because he fails to offer a basis for suspecting that the misstatements (if there were any) were deliberate or reckless and because, even if any of those misstatements were removed, Agent Marchand's affidavit would have still supported a finding of probable cause.

### Conclusion

For the reasons provided above, the Court **DENIES** De Castro's motion to suppress for violation of the necessity requirement of Title III and the Court **DENIES** De Castro's request for a *Franks* hearing.

**IT IS SO ORDERED.**