# United States Court of Appeals
## For the First Circuit

Nos. 07-2129, 07-2130

UNITED STATES OF AMERICA,

Appellee,

v.

CRISTIAN AYALA-GARCÍA,
JOSÉ LUIS ALICEA-COTTO,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García Gregory, U.S. District Judge]

Before

Boudin, Hansen,* and Lipez, Circuit Judges.

Robert Millán for appellant Ayala-García.
Jorge E. Rivera-Ortíz for appellant Alicea-Cotto.
George A. Massucco La Taif, with whom Rosa Emilia Rodriguez-Velez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Luke Cass, Assistant United States Attorney, were on brief, for appellee.

July 24, 2009

*Of the Eighth Circuit, sitting by designation.

**LIPEZ, Circuit Judge**. Appellant José Luis Alicea-Cotto appeals his conviction on drug distribution and firearms charges, and appellant Cristian Ayala-García appeals his conviction on a single firearms charge stemming from the same incident. Both men claim that the evidence presented at their joint trial was insufficient to support their convictions and that statements made by the prosecutor during rebuttal, including a suggestion that the defendants were planning to gun down dozens of innocent individuals, unfairly prejudiced the jury against them. After a close review of the record and relevant caselaw, we agree that Alicea-Cotto's conviction on one firearms count must be reversed due to insufficient evidence and that the prosecutor's improper remarks "so poisoned the well that a new trial is required" for both defendants on the remaining counts. United States v. Manning, 23 F.3d 570, 574 (1st Cir. 1994) (citations and quotation marks omitted).

## I.

The charges against defendants Alicea-Cotto and Ayala-García arose from events that took place at the Sabana Abajo housing project in Carolina, Puerto Rico, on May 25, 2006. At trial, the prosecution and defense witnesses offered starkly different accounts of what occurred. Although we take the facts in the light most favorable to the government in assessing the defendants' sufficiency claims, see United States v. Angulo-

-2-

Hernández, 565 F.3d 2, 7 (1st Cir. 2009), the prosecutorial misconduct claim obliges us to consider as well the defendants' contrary view of the events in question. We first recite the facts as the jury could have found them.

The incident began when two undercover Puerto Rico police officers, Luis Vega López ("Vega") and José M. Sánchez Santiago ("Sánchez"), were ordered to investigate a drug point on the south side of the Sabana Abajo housing project. As they drove onto the grounds of the project, they noticed the defendants and another man, Benny Alvarado-Arroyo ("Alvarado"),[1] standing next to a Nissan Pathfinder Armada sport utility vehicle ("SUV") whose rear hatch door was open. From a distance of about sixty feet, both officers saw Alicea-Cotto hand a pistol to Alvarado, who put the gun in his waistband and covered it with his shirt. Alvarado then handed money to Alicea-Cotto, ostensibly paying for the firearm. Ayala-García stood nearby, watching the transaction.

Vega and Sánchez exited their vehicle, approached the defendants, and identified themselves as police officers. Approximately twelve feet away from the defendants, four men were sitting on a set of steps near a dumpster watching the activity. Vega testified that he arrested Alicea-Cotto and seized the cash from his hand. Sánchez arrested Alvarado and Ayala-García.

_____

[1] Although jointly tried with Alicea-Cotto and Ayala-García, Alvarado is not an appellant in this consolidated appeal.

-3-

Sánchez seized a pistol from Ayala-Garcia, along with a loaded magazine, and also took the handgun from Alvarado's waistband. The weapon recovered from Ayala-García was a loaded 9mm Ruger pistol with an obliterated serial number; the weapon in Alvarado's waistband was a Smith & Wesson 9mm pistol that had been reported stolen to the Puerto Rico Police Department in 1998.

Looking into the open rear of the SUV, which Alicea-Cotto said belonged to him, Vega saw the tip of a rifle sticking out from under a t-shirt. He removed the shirt to reveal an AK-47 assault rifle, which was loaded with thirty-one bullets. Vega then looked inside the driver's side door, which also was open, and saw a transparent plastic bag on the floor in front of the passenger seat. The bag contained $1,068 in cash and assorted narcotics: ninety plastic cylinders of crack cocaine (totaling 10.8 grams), forty-four small plastic bags of cocaine (totaling 10 grams), fifty-six aluminum wrappers of heroin (totaling three grams), and a single small plastic bag containing 1.2 grams of marijuana.

Backup Puerto Rico police officers had arrived as the arrests were taking place, and additional officers arrived shortly thereafter – bringing the total number at the scene to at least ten. In addition to the appellants and Alvarado, the four men who had been sitting on the steps also were arrested. The defendants were driven in a police vehicle, along with the drugs and guns, to

the narcotics division in Carolina, Puerto Rico, and the SUV also was brought there by Vega, Sánchez and a third officer.

Alicea-Cotto was indicted on six counts stemming from the May 25 incident: aiding and abetting possession of a stolen firearm (the Smith & Wesson 9mm pistol), in violation of 18 U.S.C. §§ 922(j) and 2 (Count One); aiding and abetting unlawful possession of heroin, cocaine base, cocaine and marijuana, with the intent to distribute the drugs, in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2 (Counts Three, Four, Five and Six); and knowing possession of firearms (the pistol and the AK-47 rifle) in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) (Count Seven). Ayala-García was charged in Count Two with knowing possession of a firearm with an obliterated serial number (the Ruger pistol), in violation of 18 U.S.C. § 922(k). Although Ayala-García originally was charged with Alicea-Cotto on the drug counts (Three through Six), the district court later granted the government's motion to dismiss those counts against him.

At the seven-day trial, the defense claimed that the government's case was fabricated. Six eyewitnesses – two men who were arrested with appellants and four residents of the housing project who were in the area or saw the activity from their windows – testified that the defendants were among the men sitting on the steps when the officers entered the housing project. The officers

immediately proceeded to search each of the men, but found nothing. Several of the officers then went to search a nearby wooded area and emerged with a large, black, duffle-type bag. Some witnesses said they heard an officer yell "bingo!" when the bag was removed from the brush.

According to the defense witnesses, all seven men who had been sitting on the steps were arrested and placed in a police van. Alicea-Cotto was the last to be brought to the van because the officers took him first to the Nissan Armada and kept him there while they searched the vehicle. The officers found only some money in the SUV. The arrested men were then all transported to the drug division in Carolina. The two men in that group who appeared as defense witnesses, Luis Geraldo Cruz-Ortiz and Joan Ojeda, testified that they saw officers take the weapons that were displayed at appellants' trial out of the black bag at the police station, and Cruz-Ortiz said that he also saw the drugs removed from the bag. Cruz-Ortiz, Ojeda and the two others who were not charged were released at about midnight.

Testimony from one or more of the defense witnesses contradicted, or varied from, the officers' testimony in several other significant respects: (1) the witnesses reported that all doors on the SUV were closed when the officers arrived, and the officers opened them; (2) one officer was heard to say "[t]here is nothing here" after the officers searched Alicea-Cotto's vehicle;

and (3) the witnesses saw no firearms transaction take place between Alicea-Cotto and Alvarado, and they saw no weapons at all in the defendants' possession. During the government's presentation of rebuttal evidence, one of the backup officers, Ender Meléndez, testified that no black bag was ever recovered at the scene.

In the government's rebuttal argument, the prosecutor made the following remarks that the government concedes were improper:

> Ladies and gentlemen of the jury, those (indicating) are bullets from an AK-47 assault rifle. There are 31 of those bullets that were in this gun, ready to go on May 25th. Thirty-one potential lives were saved on May 25th, 2006. And for that, the district of Puerto Rico should be thankful, 31 lives were saved.

The prosecutor made a number of other comments that defendants challenge as improper, including urging the jury to look at the size of the bullets and asserting that Alicea-Cotto was "armed for a war that goes on every day in public housing projects around Puerto Rico."[2]

---

[2] That statement was included in the following passage from the prosecutor's lengthy rebuttal:

> And, ladies and gentlemen of the jury, when I first looked at this case and thought of all of the ironic situations, isn't it ironic that this car that was owned by José Luis Alicea Cotta was an Armada? Isn't that just ironic?
> Because that's exactly what it was. It was an Armada. He was armed. He was armed for a war that goes on every day in public housing projects around Puerto

Defendants moved for a mistrial based on the prosecutor's remarks. In denying the motions, the district court stated that it would instruct the jury to judge the defendants "only on the evidence that has been presented, not on those comments." The court also rejected defendants' motions for a judgment of acquittal under Federal Rule of Criminal Procedure 29.

Alicea-Cotto was found guilty on the two firearms charges (Counts One and Seven) and three drug charges (Counts Three through Five), but not guilty on the marijuana distribution crime alleged in Count Six. Ayala-García was found guilty on the only charge remaining against him, Count Two, which alleged the unlawful possession of a firearm with an obliterated serial number.[3] Alicea-Cotto was subsequently sentenced to a term of sixty-three months on Counts One, Three, Four and Five, to be served concurrently, and a consecutive sixty-month term on Count Seven. Ayala-García was sentenced to time served.

On appeal, defendants Ayala-García and Alicea-Cotto argue that their convictions must be overturned, and judgments of acquittal entered, because the evidence presented by the government

_____

Rico, around the United States, in every jurisdiction, in every district, poor people, rich people, fat people, tall people, hungry people, they face this reality every day.

[3] The third defendant, Alvarado, was found guilty along with Alicea-Cotto on Count One, charging unlawful possession of a stolen firearm.

-8-

failed to establish the elements of the offenses charged beyond a reasonable doubt. Alternatively, they claim a right to a new trial because portions of the government's closing argument were inflammatory and highly prejudicial, tainting the jury's deliberations and thus denying defendants a fair verdict based on the evidence.

## II.

Appellants argue that the evidence was insufficient to support their convictions because the record equally supports a finding of guilt and a finding of innocence – necessarily giving rise to a reasonable doubt that invalidates their convictions. This contention, which is based on the witnesses' conflicting testimony about what occurred on May 25, misses the mark. The government's evidence is not insufficient simply because the defense presented a competing scenario through its own witnesses. Where an evidentiary conflict turns on witness credibility, the jury decides whom to believe. United States v. Thomas, 467 F.3d 49, 55 (1st Cir. 2006) ("It is . . . within the unique province of the jury to sift through conflicting evidence, assess the credibility of the witnesses, and find facts."). A judgment of acquittal based on equally viable prosecution and defense theories is required only where the evidence is in equipoise, or nearly so, even when viewed in the government's favor. See United States v. Woodward, 149 F.3d 46, 57 (1st Cir. 1998) ("[A]n appellate court

must reverse a conviction on the grounds of evidentiary insufficiency where an equal or nearly equal theory of guilt[] and a theory of innocence is supported by the evidence <u>viewed in the light most favorable to the verdict</u>." (quotation marks and citations omitted; alterations in original; emphasis added)).

This is not such a case. As we shall explain, the evidence viewed through the proper lens allows a finding of guilt beyond a reasonable doubt on all but one of the crimes charged against the defendants, and the one failure of proof is unrelated to the witnesses' dueling testimony. In evaluating the record, we apply the de novo standard of review and "draw all reasonable evidentiary inferences in harmony with the verdict and resolve all issues of credibility in the light most favorable to the government." <u>United States</u> v. <u>Sherman</u>, 551 F.3d 45, 49 (1st Cir. 2008) (quotation marks and citation omitted).

## A. Ayala-García's Sufficiency Claim

Ayala-García was convicted only on Count Two, which charged him with knowing possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k). He emphasizes that the defense witnesses "were not impeached by the prosecution at trial" and further argues that the verdict resulted from factors other than the credibility of the witnesses, including the prosecutor's inflammatory statements during the rebuttal portion of the closing argument.

Whether or not the defense witnesses were explicitly impeached is of no consequence to our inquiry. As we have explained, the jury was free to choose which of the two conflicting accounts of the events to believe, so long as the evidence viewed in the government's favor is adequate to establish guilt beyond a reasonable doubt. See United States v. Scott, 564 F.3d 34, 39-40 (1st Cir. 2009). Whether prosecutorial misconduct tainted the jury's consideration of the evidence is a question we will address in Section III. Here, therefore, we consider only whether the evidence adduced by the government allowed a rational jury to find beyond a reasonable doubt that Ayala-García violated section 922(k).

To establish Ayala-García's guilt, the government needed to prove that (1) he possessed the firearm, (2) the gun had moved through interstate commerce, and (3) he had actual knowledge of the obliterated serial number. United States v. Sánchez-Badillo, 540 F.3d 24, 31-32 (1st Cir. 2008). The possession prong was directly established through the testimony of Officers Vega and Sánchez. Vega testified that he saw a gun in Ayala-García's pocket, and Sánchez testified that he recovered the pistol from Ayala-García at the time of his arrest. To satisfy the interstate commerce element, the government elicited testimony that the gun had been manufactured in Prescott, Arizona. This was sufficient. See United States v. Teleguz, 492 F.3d 80, 87 (1st Cir. 2007) (holding

-11-

that the interstate nexus element is met with evidence that the firearms "necessarily had crossed state or foreign lines because they were originally manufactured in other states or countries"). Finally, Ayala-García's knowledge of the obliterated serial number was circumstantially established by his possession of the firearm. See Sánchez-Badillo, 540 F.3d at 32.

Accordingly, we reject Ayala-García's sufficiency claim.

## B. Alicea-Cotto's Sufficiency Claims

Alicea-Cotto asserts that the evidence was insufficient to establish his guilt on any of the five charges for which he was convicted.[4] In support of this claim, he primarily relies on discrepancies in the testimony of the government's witnesses and emphasizes differences between testimony presented by Officers Vega and Sánchez at trial and their testimony at an earlier suppression hearing.[5] He appears to claim, in effect, that these inconsistencies foreclosed a finding of guilt beyond a reasonable doubt.

---

[4] As noted supra, Alicea-Cotto was charged with aiding and abetting the unlawful possession of a stolen firearm (Count One); aiding and abetting unlawful possession of heroin, cocaine base, cocaine and marijuana, with the intent to distribute the drugs (Counts Three through Six); and knowing possession of firearms in furtherance of a drug trafficking crime (Count Seven). He was acquitted on Count Six, the marijuana charge.

[5] Alicea-Cotto highlights, for example, Sánchez's testimony about when he first saw the drugs that were found in the SUV and Vega's testimony about which officers were in the SUV when it was transported from the housing project to the police station.

This contention is unavailing.  We previously have observed that "[e]vidence does not become legally insufficient merely because of some inconsistencies in witnesses' testimony." United States v. Rodriguez, 457 F.3d 109, 119 (1st Cir. 2006).  The question we must answer is whether the jury's verdict is supported by "a plausible rendition" of the evidence taken as a whole, United States v. Lopez-Lopez, 282 F.3d 1, 19 (1st Cir. 2002), keeping in mind that credibility issues must be resolved in favor of the government.  See Angulo-Hernández, 565 F.3d at 7 ("We do not atomize our analysis.  We consider the evidence in its totality, not in isolation, and the government need not negate every theory of innocence.") (quotation marks and citations omitted).

We therefore proceed to consider whether a rational jury could have concluded that the government proved each element of the crimes charged against Alicea-Cotto beyond a reasonable doubt.

1.  The Drug Counts: Possession of Narcotics with Intent to Distribute  (Counts Three, Four and Five)

To prove that Alicea-Cotto possessed controlled substances for purposes of section 841(a)(1), it was sufficient for the government to show that he had constructive possession of the drugs, i.e., that he exercised "dominion and control over [the] area where [the] narcotics [were] found." United States v. Gobbi, 471 F.3d 302, 309 (1st Cir. 2006) (quotation marks and citation

-13-

omitted); see also United States v. García-Carrasquillo, 483 F.3d 124, 130 (1st Cir. 2007). Officer Vega testified that he found the transparent bag containing the drugs in plain view on the floor of the Nissan Armada. Alicea-Cotto acknowledged that the vehicle belonged to him, and he was standing beside the SUV moments before Vega discovered the drugs. His ownership of, and proximity to, the vehicle permitted the jury to infer that Alicea-Cotto had "dominion and control" over the location where the drugs were found and, consequently, to find that he constructively possessed the narcotics. See, e.g., United States v. Johnson, 470 F.3d 1234, 1238 (8th Cir. 2006) ("To prove constructive possession, the Government must show that [defendant] had knowledge and ownership, dominion, or control over the contraband itself, or dominion over the vehicle in which the contraband [was] concealed.") (quotation marks and citation omitted); United States v. Olivo-Infante, 938 F.2d 1406, 1411 (1st Cir. 1991) (holding that jury could reasonably infer defendant's constructive possession of cocaine that was found in his car).

The record also supports the jury's finding that Alicea-Cotto intended to distribute the drugs. We have held that a large amount and individual packaging of drugs is sufficient to demonstrate an intent to distribute for purposes of section 841(a)(1). See García-Carrisquillo, 483 F.3d at 130 n.12. Here, the packaging alone was strong circumstantial evidence that the

drugs were intended for distribution.  Officer Vega testified that the plastic bag he found in the SUV contained ninety plastic cylinders of cocaine base, forty-four plastic bags of cocaine and fifty-six aluminum wrappings of heroin.  The jury reasonably could infer from the number of separate packages – 190 – that the cocaine, cocaine base and heroin were intended for distribution rather than for personal consumption.  See, e.g., United States v. Gentry, 555 F.3d 659, 667 (8th Cir. 2009) ("[T]he fact that the methamphetamine in the bag was further subdivided into seven Ziploc baggies[] supports a finding of intent to distribute.").[6]  The large amount of cash in the plastic bag with the drugs reinforced that inference.

Sufficient evidence therefore supported Alicea-Cotto's convictions on Counts Three, Four and Five charging possession with intent to distribute cocaine, cocaine base and heroin.

2.  Aiding and Abetting Possession of a Stolen Firearm in violation of 18 U.S.C. §§ 922(j) and 2 (Count One)

Alicea-Cotto was charged under section 922(j) with possession of the Smith & Wesson 9mm pistol that was recovered from Alvarado's waistband.  To prove guilt under that provision, the government needed to establish that Alicea-Cotto possessed the gun

---

[6] The jury, by contrast, rejected the marijuana distribution count.  Only one small plastic bag of marijuana, weighing 1.2 grams, was in the larger transparent bag that contained all of the drugs.

"knowing or having reasonable cause to believe" it was stolen. 18 U.S.C. § 922(j). Possession of the weapon was established through the testimony of Officers Vega and Sánchez, who reported seeing Alicea-Cotto hand the gun to Alvarado and receive money in exchange. The government also elicited evidence that the gun was reported stolen to the Puerto Rico Police Department in 1998.[7]

Alicea-Cotto claims, however, that the government failed to adduce evidence showing that he knew, or had reason to believe, that the gun was stolen. In its brief, the government cites no evidence of such knowledge. Instead, the government asserts that "there was never any evidence Alicea-Cotto legally purchased the gun or registered it in his name" and argues that the jury could rationally infer that he knew the gun did not belong to him. At trial, the government conceded in closing argument the lack of direct evidence of Alicea-Cotto's and Alvarado's scienter, and then focused its argument on what Alvarado – the purchaser of the gun – must have known:

> I ask you, Thursday afternoon, 4:30 in the afternoon, broad daylight, kids running around, in a public housing project a man buys a weapon from another man. He doesn't get a receipt, he doesn't get a license, doesn't fulfill any of the requirements that he would otherwise have to do if he went to a gun store.

---

[7] The government met the statute's interstate commerce element with expert testimony that the gun was manufactured in Springfield, Massachusetts, and necessarily traveled in interstate commerce to reach Puerto Rico.

What can he presume – what can he know about that weapon? And what, being a reasonable tryer[sic] of fact, should you, the jury, circumstantially infer? What is a common-sense inference from that transaction?

The common sense inference from that transaction, ladies and gentlemen, is that he knew it was stolen. Why else would he go and buy a gun in a housing project? Why didn't he go to the store? Why didn't he get a receipt?

Why didn't he take a class and get the license, and go to the armory and practice shooting? Why didn't he do any of that? Why? Because he was buying a Saturday night special. He was buying a gun he knew, or should have known, was stolen.

The government made a similar argument when responding to Alicea-Cotto's and Alvarado's motions for acquittal on Count One, arguing to the district court that the purchase of the firearm "for cash in broad daylight in a public housing project[] circumstantially creates the inference that it was a stolen weapon." Alvarado's counsel challenged that assertion – asking if "every transaction that occurs in a public housing project is illegal just because it's in a public housing project" – and the prosecutor replied, "[e]very weapons transaction, yes, Your Honor. . . . [I]t is unlawful to sell weapons." Pressed to identify the evidence before the jury on Alvarado's knowledge, the prosecutor stated:

The evidence is your client bought a gun in a housing project, for several hundred dollars, from a vehicle with an AK47 sticking out the back, from a guy who had drugs in the front. And is that illegal? Yes.

-17-

Although the government may be correct that the evidence permitted the jury to conclude that the weapons transaction was unlawful,[8] we see no evidence to support the particular finding of knowledge required to support a conviction under section 922(j), i.e., that Alicea-Cotto knew, or had reason to believe, that the weapon he sold to Alvarado had been stolen. The government's argument about the suspicious circumstances would equally apply if Alicea-Cotto had been unlawfully reselling a firearm that an associate had legitimately acquired. Indeed, the government on appeal does not even attempt to support the jury's finding on Alicea-Cotto's scienter with citations to the record, and instead reverses the burden of proof by asserting that Alicea-Cotto offered no evidence that he was the gun's lawful owner.

The cases cited by the government in support of its position are easily distinguishable. In United States v. Iron Eyes, 367 F.3d 781, 783 (8th Cir. 2004), the defendant was found carrying two rifles outside the home from which the weapons had just been stolen. In United States v. McBane, 433 F.3d 344, 349

---

[8] We need not delve into whether the sale would in fact have been illegal if the gun had not been stolen. We note, however, that during argument on the motion for acquittal defense counsel emphasized the absence of evidence that "buying a weapon in broad daylight on the street is even illegal," and stated that, "[i]n many states buying a weapon at a flea market on the street is absolutely legal with no documentation." He continued: "This jury has heard nothing to make a transaction of cash for a weapon with a serial number on it illegal or wrong or whether that weapon [was] stolen."

(3d Cir. 2005), the jury was read an admission from the defendant stating that he knew the gun had been taken from its rightful owner.  In another Eighth Circuit case involving section 922(j), United States v. Provost, 237 F.3d 934, 937 (8th Cir. 2001), the defendant was present when a companion stole three rifles from a house, and he participated in conversations about how to sell the guns for cash.  By contrast, in United States v. Mobley, 956 F.2d 450 (3d Cir. 1992), the government conceded that it could not have proven the scienter element of section 922(j), id. at 460 & n.1 (Mansmann, J., dissenting), even though the defendant admitted purchasing the gun at issue from a drug dealer, id. at 451.

To affirm the stolen weapon conviction on the record before us would be, in effect, to read the scienter requirement out of the statute.  We decline to do so, and we therefore reverse the judgment of guilt against Alicea-Cotto on Count One.

3.    Possession of a Firearm in Furtherance of a Drug Trafficking Crime (Count Seven)

Alicea-Cotto's challenge to his conviction on the section 924(c) charge focuses solely on inconsistencies and gaps in the officers' testimony.  Among other points, he notes that (1) the t-shirt that supposedly covered the AK-47 in the back of the SUV was never produced, (2) Vega originally gave an incorrect serial number for that weapon, and (3) Sánchez admitted in cross-examination that he saw the rifle for the first time at police headquarters even

though it supposedly was visible through the open rear door of the SUV. All of these contentions, however, concern the believability of the officers' testimony, a matter outside our inquiry. Alicea-Cotto does not argue that the evidence presented – if believed – was insufficient to establish that he possessed the rifle in furtherance of a drug trafficking offense, and any such argument is therefore waived. United States v. Marsh, 561 F.3d 81, 83 n.4 (1st Cir. 2009) (noting that an argument not briefed on appeal is deemed waived).[9]

The argument would, in any event, be futile. We already have determined that the jury reasonably could infer Alicea-Cotto's constructive possession of the drugs found in his vehicle, and the same possession analysis applies to the AK-47. We also have upheld the jury's finding of guilt on the drug trafficking charges. The government additionally needed to demonstrate "some sufficient nexus between the firearm and the drug trafficking offense." United States v. Robinson, 473 F.3d 387, 399 (1st Cir. 2007); see also Sherman, 551 F.3d at 49. Among the relevant factors are "whether the firearm was loaded, whether the firearm was easily accessible, the proximity of the firearm to the drugs, and the surrounding circumstances." Robinson, 473 F.3d at 400; see also

---

[9] The indictment charged possession of both the Smith & Wesson pistol and the AK-47 rifle under Count Seven. For convenience, we address only possession of the rifle, which is sufficient to support the conviction.

United States v. Rogers, 556 F.3d 1130, 1140 (10th Cir. 2009) ("The intent to possess the weapon to further the drug trafficking crime is generally proven through circumstantial evidence . . .").

The facts here provide ample circumstantial support for the jury's finding that Alicea-Cotto possessed the AK-47 to further his drug trafficking activities. The loaded AK-47 was found in the vehicle with the drugs, where it was easily accessible and, indeed, partially in plain view. See Robinson, 473 F.3d at 399 (observing that "a sufficient nexus is more readily found in cases where the firearm is in plain view and accessible to the defendant"). Although no drug transaction was observed, the jury could rationally infer that the gun was in the back of the SUV to protect the ongoing drug-trafficking activity reflected by the drugs and money up front. Our observation in United States v. Garner, 338 F.3d 78 (1st Cir. 2003), is equally apt here:

> When guns and drugs are found together and a defendant has been convicted of possession with intent to distribute, the gun, whether kept for protection from robbery of drug-sale proceeds, or to enforce payment for drugs, may reasonably be considered to be possessed "in furtherance of" an ongoing drug-trafficking crime.

Id. at 81. We therefore reject Alicea-Cotto's sufficiency claim with respect to Count Seven.

## III.

Both appellants contend that improper statements made by the prosecutor during the rebuttal portion of his closing argument

-21-

were so prejudicial that a new trial is required. When defendants contemporaneously object to challenged comments, as the government acknowledges occurred here, we review de novo whether the remarks amounted to prosecutorial misconduct. United States v. Vázquez-Botet, 532 F.3d 37, 57 (1st Cir. 2008). If we conclude that misconduct occurred, we then "ask whether the prosecutor's behavior 'so poisoned the well' that the defendant[s] must be given a new trial." Id. at 56 (quoting Manning, 23 F.3d at 573); United States v. Vázquez-Rivera, 407 F.3d 476, 486 (1st Cir. 2005) (observing that reversal is warranted only if prosecutor's remarks "have likely affected the trial's outcome") (quotation marks and citation omitted). The district court's decision on whether to grant a new trial is reviewed for abuse of discretion. Robinson, 473 F.3d at 393.

**A. Were the Prosecutor's Remarks Improper?**

It is well established that "it is improper to 'needlessly arouse the emotions of the jury.'" Robinson, 473 F.3d at 397 (quoting United States v. Pirovolos, 844 F.2d 415, 425 (7th Cir. 1988)). We have held that misconduct occurs when a prosecutor "interject[s] issues having no bearing on the defendant's guilt or innocence and improperly appeal[s] to the jury to act in ways other than as dispassionate arbiters of the facts." United States v. Mooney, 315 F.3d 54, 59 (1st Cir. 2002) (finding misconduct where prosecutor's remarks during the opening statement "contrast[ed] the

-22-

jurors' sense of community safety with the armed robbery" at issue); <u>United States</u> v. <u>Whiting</u>, 28 F.3d 1296, 1302 (1st Cir. 1994) (finding misconduct where prosecutor noted defendant's harm to "the kids of Roxbury" and exhorted jury during rebuttal argument to find guilt to protect "other kids" from guns, drugs and violence); <u>Arrieta-Agressot</u> v. <u>United States</u>, 3 F.3d 525, 527 (1st Cir. 1993) (finding closing argument inflammatory and impermissible where prosecutor urged jury to consider the case "as a battle in the war against drugs, and the defendants as enemy soldiers") (citing similar cases). Even unintentional misrepresentations of the record can constitute misconduct under certain circumstances. <u>See</u> <u>United States</u> v. <u>Azubike</u>, 504 F.3d 30, 38 (1st Cir. 2007).

Appellants contend that the prosecutor committed misconduct because the rebuttal argument contained multiple statements that were either inaccurate, highly inflammatory, or both. They specifically cite the following comments:

- Ladies and gentlemen of the jury, those (indicating) are bullets from an AK-47 assault rifle. There are 31 of those bullets that were in this gun, ready to go on May 25th. Thirty-one potential lives were saved on May 25th, 2006. And for that, the district of Puerto Rico should be thankful, 31 lives were saved.

- Do you see the size of these things? Do you see the size of these bullets? You can take them back with you. You can look at them.

- The problem today is there [are] too many people living in public housing projects that are willing to look the other way and not take

-23-

responsibility for what happened or protect people that need to be here in court and prosecuted . . . because they're afraid for their lives . . .

• How can you reconcile looking the other way? . . . It should offend the sense of justice, ladies and gentlemen of the jury.

• . . . [I]sn't it ironic that this car that was owned by Jose Luis Alicea Cotto was an Armada? Isn't that just ironic?
    Because that's exactly what it was. It was an Armada. He was armed. He was armed for a war that goes on every day in public housing projects around Puerto Rico, around the United States, in every jurisdiction, in every district, poor people, rich people, fat people, tall people, hungry people, they face this reality every day.

• And on behalf of the United States and the District of Puerto Rico, I charge you to do your job, find the Defendants guilty.

We have no difficulty concluding that portions of the prosecutor's remarks crossed the bounds of proper argument. Nothing in the record justified the statement that "31 lives were saved." Invoking the thirty-one bullets in that way, while also urging the jurors to consider their size, could have served no purpose other than to inflame the jury's passions by depicting the defendants as dangerous men who needed to be put away for a long time. Indeed, the government explicitly concedes that the "31 lives" remark was improper. In addition, the prosecutor's comment that Alicea-Cotto was "armed for a war that goes on every day in public housing projects" is reminiscent of language we deemed improper in Arrieta-Agressot, which described the defendants as

-24-

enemy soldiers in "a battle in the war against drugs." See also United States v. Sepulveda, 15 F.3d 1161, 1189 (1st Cir. 1993) ("[W]e deplore frank appeals to passion of the sort typified by 'war on drugs' rhetoric . . ."). Also disturbing is the prosecutor's admonition to the jury to "do your job, find the Defendants guilty." See United States v. Young, 470 U.S. 1, 18 (1985) (finding that a prosecutor erred in urging a jury to "do its job"); United States v. Andújar-Basco, 488 F.3d 549, 561 (1st Cir. 2007) (noting government's concession that exhorting the jury to do "your duty" was improper); United States v. Mandelbaum, 803 F.2d 42, 44 (1st Cir. 1986) ("There should be no suggestion that a jury has a duty to decide one way or the other; such an appeal is designed to stir passion and can only distract a jury from its actual duty: impartiality.").[10]

The government argues that certain of the challenged statements were proper and that the summation as a whole must be viewed in the context of defense counsel's closing, which included comments about crime in public housing projects[11] and an assertion

---

[10] Defendants did not explicitly object at trial to the "do your job" language. Since the defendant did not make a contemporaneous objection, we apply the demanding plain error standard, and it is far from clear that the "do your job" language, although inappropriate, would warrant reversal on its own. Still, we give it weight for its cumulative effect when combined with the other statements suggesting violence.

[11] Ayala-García's lawyer told the jury: "You have no family from a low income housing project, but it seems to me that the prosecution is trying to make you believe that everything that

-25-

that the police officers who testified were "bordering on perjury."[12] Although acknowledging that "two wrongs do not make a right," the government urges us to consider that its rebuttal was a response to defense counsel's own "incendiary rhetoric."

Our cases establish that some leeway is appropriate when the government's challenged comments may fairly be seen as a response to comparable remarks by defense counsel. See, e.g., United States v. Skerret-Ortega, 529 F.3d 33, 40 (1st Cir. 2008) ("The Government's response to statements made by defendant's counsel cannot and should not be viewed the same way as statements made by the Government without provocation."); United States v. Hansen, 434 F.3d 92, 102 (1st Cir. 2006) (noting that "we 'typically cede prosecutors some latitude in responding to defense counsel's allegations of fabrication'" (quoting United States v. Perez-Ruiz, 353 F.3d 1, 10 (1st Cir. 2003))); Sepulveda, 15 F.3d at 1189 ("Courts should allow prosecutors greater leeway in rebuttal

---

happens there is a crime so you'd have to find them guilty beyond a reasonable doubt because they live in a low income housing project."

[12] Among other remarks suggesting that the government's case was fabricated, Alvarado's lawyer stated: "[F]rom your own knowledge of the Puerto Rican culture, what's going on in the streets of Puerto Rico today and you're[sic} having lived here, there are police officers who are ready, willing and able to cuadro, to square their cases. That's what happened here, that's what happened here." He also urged the jurors to "have the courage . . . to throw this case out . . . because it's no good," and to let the police officers know that "if you're coming here, you better come with the truth because we're not going to believe you if you lie."

when the defense has itself breached the standards for proper summation."). The latitude afforded prosecutors is not, however, boundless. We have "warned prosecutors that 'there are limits to the extent that we will permit fighting fire with fire.'" Sepúlveda, 15 F.3d at 1189 n.24 (quoting United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987)).

Even if some of the challenged statements could be viewed in context as understandable, or even appropriate, there is no sugar-coating the prosecutor's wholly unjustified and inflammatory reference to the potential loss of thirty-one lives. The prosecutor's emphasis on the size of the bullets added fuel to the fire. At a minimum, those statements constituted misconduct. Moreover, we cannot isolate them from other statements that, in context, crossed over the line of proper rebuttal. Of particular concern is the prosecutor's assertion that Alicea-Cotto was engaged in a war at the public housing project. That comment further magnified the threat of violence evoked by the "31 lives" and bullet remarks. See United States v. Potter, 463 F.3d 9, 24 (1st Cir. 2006) (noting that defendants "fairly argue that we should consider [an] improper comment not alone but together with any other significant errors in the prosecutor's closing"); Mejia-Lozano, 829 F.2d at 274 n.4 (considering whether "cumulative effect of missteps in the prosecutor's closing argument could conceivably have skewed the balance").

-27-

We thus move to the next step of our inquiry, determining whether the prosecutor's improper comments "so poisoned the well that the trial's outcome was likely affected." Mejia-Lozano, 829 F.2d at 274.

**B. Did the Improper Remarks Result in Prejudice Requiring a New Trial?**

We weigh several factors in determining whether a new trial is warranted based on the prosecutor's improper remarks, including: "the severity of the misconduct; whether it was deliberate or accidental; the context in which it occurred; whether the judge gave any curative instructions and their likely effect; and the strength of the evidence against the defendant." Mooney, 315 F.3d at 60. See also Azubike, 504 F.3d at 39; Robinson, 473 F.3d at 398.

The plainly improper comment about saving thirty-one lives suggested to the jurors that the defendants were potential killers who would have murdered thirty-one individuals if they had not been arrested. As we previously have observed, "[i]t is hard enough for a jury to remain dispassionate and objective amidst the tensions and turmoil of a criminal trial," Arrieta-Agressot, 3 F.3d at 527, and the dramatic assertion that dozens of lives were at risk that day burdened the defendants with accusations far more potent than the charges on which they were being tried. Indeed, the jury could have gleaned from that emphatic statement that the

prosecutors knew something about the defendants' intentions beyond what had been revealed at trial. The prejudicial impact of that rhetoric was inescapably severe.

Although the insinuation that the defendants intended a mass killing was not repeated, the remark was immediately followed by the prosecutor's entreaty that the jurors look at the size of the bullets and his observation that "too many people living in public housing projects" shirk their responsibility for violent crime by looking the other way. These comments effectively told the jurors that they needed to assume the responsibility – refused by others – for preventing violence with such horrific weapons. The prosecutor continued his summation by properly reviewing conflicts in the evidence, urging the jurors to reject the "incredible" testimony of the defense witnesses, but then again resorted to highly charged rhetoric – accusing Alicea-Cotto of being armed for the "war that goes on every day in public housing projects . . . in every jurisdiction." After asking the jurors to use their common sense to review the evidence, the prosecutor concluded by telling them to "do your job, find the Defendants guilty."

We cannot say that the harm from the "31 lives" and bullet comments was defused by the remainder of the prosecutor's rebuttal argument. To the contrary, the prosecutor's subsequent use of other language that we have previously condemned – in

particular, the imagery of a war on crime and the jury's duty to convict – combined to create the message that the jurors must take responsibility for fighting back against violent crime by convicting these highly dangerous individuals. Moreover, the rebuttal context increased the likelihood of prejudice because the improper remarks were among "the last words spoken to the jury by the trial attorneys." Manning, 23 F.3d at 575; see also Azubike, 504 F.3d at 39 (noting that "prejudicial statements made during closing argument 'militate in favor of reversal'") (quoting Manning, 23 F.3d 570 at 575); cf. Mooney, 315 F.3d at 60 ("The comments occurred during opening arguments, not during summation where the last words the jury hears have significant potential to cause prejudice.").

Immediately following the rebuttal argument, Alicea-Cotto's counsel requested an instruction advising the jurors to disregard "the prejudicial remarks made as to residents of public housing projects." The court responded with this statement to the jury:

> What you stated is pure argument, which the jury is not going to take into account. It is only the evidence that the jury heard here with respect to those witnesses, the physical objects, as well as the exhibits, okay?
> Remember, I want this very clear, this is pure argument. Okay, and whatever has been said, you know, it's simply to try to persuade you. But you are the sole judges of the facts, okay?

Following a break in the proceedings, but before the jury returned, appellants moved for a mistrial based on the various statements described above. Alicea-Cotto's counsel specifically targeted the "31 lives" statement, arguing that "it is very prejudicial since him telling the jurors that they saved 31 lives implicates that these three young men are murderers and if they had not caught them, which is his argument, they would have murdered 31 people."[13]

In denying the motion, the court again assured defense counsel that it would instruct the jury to focus solely on the evidence and to "disregard anything that has any derogatory reference to housing projects or anything that may be happening there." The court did refer to the rebuttal argument in its charge to the jury, but did not address the "31 lives" statement in particular:

> And you have heard me say every single day that it's only the evidence that counts in this case, not arguments of counsel, not statements by counsel, not objections by counsel, not questions by counsel. And you heard arguments by counsel here at the end of this case, you know, and there were some

---

[13] The government accepts that the motion for mistrial presented a sufficiently contemporaneous objection to the prosecutor's remarks to warrant de novo review, and we have proceeded accordingly. We previously have found objections to prosecutorial arguments timely when they were made during sidebars that followed the prosecutor's rebuttal. See Azubike, 504 F.3d at 39 n.9; Mandelbaum, 803 F.2d at 44 n.1. More recently, we noted that "[o]ur recent decisions have reserved the issue of precisely when objections must be made to closing statements to preserve the objection for ordinary review," suggesting that the rule might appropriately vary with the circumstances. Potter, 463 F.3d at 23.

> references made to public housing projects and whatnot, and you are not to take that into account, okay?
>
> It's only the evidence presented, witnesses that testify here, okay, the exhibits that are presented and the physical objects.
>
> Now, so that means that you must decide the case solely on the evidence before you and according to the law. You will recall that you took an oath, promising to do so at the beginning of the case.

The court also gave the standard instructions telling the jurors that they had a duty to base their verdict "solely upon the evidence, without prejudice or sympathy," and that "statements and arguments of counsel are not evidence."

We have at times found the district court's standard instruction, advising jurors that arguments of counsel are not evidence, adequate to dispel any prejudice from improper remarks. See, e.g., Mooney, 315 F.3d at 60; Arrieta-Agressot, 3 F.3d at 529. Here, the district court additionally gave specific attention to the closing argument, reminding the jurors that the "references made to public housing projects and whatnot" should not be taken into account. The court's instruction, however, was too mild for the circumstances and thus an inadequate antidote for the misconduct. It made no reference to the prosecutor's inaccurate and inflammatory comments about the thirty-one lives and the size of the bullets – which the court simply labeled as "whatnot."[14] The

---

[14] The court also made no comment about the third unequivocally improper statement – urging the jurors to "do your job" – but, as

remarks here called for an instruction explicitly directing the jury to disregard the improper comments. See, e.g., Potter, 463 F.3d at 23 (describing trial court's instruction to the jury pointing out the problematic language and telling the jury to "disregard those comments completely"); Mooney, 315 F.3d at 59 (noting trial court's specific reference to the prosecutor's improper remarks about community safety as part of curative instruction advising the jury that "'[t]hat simply is not an appropriate issue'"). Moreover, our observation in Arrieta-Agressot also applies here:

> [T]he danger was not so much that the jury would consider the prosecutor's statements to be "evidence." Rather, the threat was that the prosecutor's remarks would excite the jury, invite a partisan response, and distract its attention from the only issue properly presented by this case: whether the evidence established the [defendants'] guilt beyond a reasonable doubt.

3 F.3d at 529-30.

The nature of the evidence raises further doubts about the efficacy of the court's instruction. Witness credibility was central to this case. Although we concluded in Section II that the evidence was sufficient to find appellants guilty on all but one of the counts of conviction, the question here is whether the prosecutor's remarks influenced the jurors' credibility assessment.

---

noted, see supra note 10, that language was not called to its attention.

-33-

See Azubike, 504 F.3d at 41 ("[T]he fact that there was sufficient evidence to convict does not mean that the jury would have convicted absent the prosecutor's improper remarks."); Arrieta-Agressot, 3 F.3d at 528 ("The jury may well have decided the issues in favor of the government, but that jury decision may itself be tainted by the improper remarks."). Appellants attempted to persuade the jury that inconsistent testimony given by the government's witnesses undermined the prosecution's case, and the government responded in kind by accusing the defense witnesses of lying. During their deliberations, the jurors requested the testimony of Officer Sánchez – indicating some uncertainty about the evidence – but were told to rely on their own recollection of what he had said. In this context, particularly given the direct conflict in the government's and defendant's evidence, and the prosecutor's hyperbole about the defendants' violent conduct, we lack "fair assurance" that the result would have been the same absent the improper statements. United States v. Meserve, 271 F.3d 314, 329 (1st Cir. 2001) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)).[15]

---

[15] The government describes the evidence against Ayala-García and Alicea-Cotto as overwhelming, which would diminish the likelihood of prejudice from the prosecutor's remarks. See, e.g., Young, 470 U.S. at 19-20 ("Not a single witness supported respondent's asserted defense . . . "); Mooney, 315 F.3d at 60; Mejia-Lozano, 829 F.2d at 274. The evidence may be seen as one-sided in the government's favor, however, only if we accept the government's own assessment of credibility and reject out-of-hand the testimony presented by the defendants' eyewitnesses.

The government argues that Alicea-Cotto's acquittal on Count Six, the marijuana conspiracy charge, shows that the jury was able to follow the district court's instructions and dispassionately weigh the evidence presented. The government reads too much into that verdict. Only a single, small plastic bag of marijuana was found in Alicea-Cotto's vehicle; acquittal on the marijuana distribution charge was thus unremarkable. Indeed, the jury's guilty verdict on the stolen weapon charge is arguably more telling. The finding that Alicea-Cotto had reason to know that the Smith & Wesson pistol was stolen – in the absence of any evidence of that fact – supports appellants' argument that the prosecutorial misconduct tainted the jury's deliberations.[16]

---

The government's witnesses were not, however, untarnished. During cross-examination, defense counsel aggressively questioned Sánchez about when he saw the drugs. At the suppression hearing, Sánchez had said he first saw them at the police station. At trial, he reported seeing them in the SUV. When asked "which time were you telling the truth," he explained that he first saw the drugs displayed at the station, but had seen the bag containing the drugs in the car.

Counsel similarly challenged Officer Vega on his testimony about who drove the SUV from the housing project to the narcotics division. At trial, Vega stated that he was in the vehicle with Sánchez and another officer, although he had testified at the suppression hearing that he could not remember who accompanied Sánchez.

On this record, we cannot say that the government's case was so overwhelming that guilty verdicts were inevitable.

[16] The Supreme Court in Young, in concluding that a prosecutor's improper rebuttal argument did not compromise the jury's deliberations, observed that the jury had acquitted the defendant of the most serious charge he faced. Young, 470 U.S. at 18 n.15.

Finally, we are again troubled that the tradition of improper closing arguments persists among some prosecutors in the United States Attorney's Office in Puerto Rico. We have repeatedly admonished that office for similar misconduct and urged the office to "redouble its efforts to educate its attorneys about the ground rules for closing arguments." Andújar-Basco, 488 F.3d at 561 n.5; see also United States v. Martínez-Medina, 279 F.3d 105, 128 & n.12 (1st Cir. 2002) (Torruella, J., concurring) (collecting cases).

In sum, our review of the circumstances persuades us that the improper comments "so poisoned the well that the trial's outcome was likely affected," Mejia-Lozano, 829 F.2d at 274, and that, consequently, a new trial is warranted. Accordingly, we vacate Ayala-García's conviction on Count Two and Alicea-Cotto's convictions on Counts Three through Five and Seven, and remand for a new trial on those counts. As discussed in Section II, we reverse Alicea-Cotto's conviction on Count One.

Reversed in part, vacated in part, and remanded for further proceedings.

So ordered.

**- Concurring Opinions Follow -**

**BOUDIN**, <u>Circuit Judge</u>, **concurring**.  Motions for a new trial in criminal cases, based on improper remarks by the prosecutor in closing, are often an uphill effort.  The government, unlike defense counsel, can pursue strong cases and pass on weak ones, and so many of its cases are strong: eye-witness testimony by eye-witnesses, audio or video tape, and co-conspirators who turn up as prosecution witnesses confront defendants who, often hindered by prior criminal records, chose not to take the stand.

Prosecutors do sometimes make statements that judges find impermissible.  Yet the variables are numerous and work against easy rules of thumb: statements may be improper for different reasons and in varying degrees; they may be fine in some contexts and not in others (<u>e.g.</u>, depending on the trial evidence); provocation or fair response may mitigate or excuse; corrective instructions may or may not be given and, if given, vary in their force; and judges also vary in what they think allowable comment.

Complicating the equation is the requirement of harm: if no objection was made, the defense must show (among other things) that an objectionable statement caused prejudice.[17]  This is a demanding requirement which, along with other <u>Olano</u> factors, <u>United States</u> v. <u>Olano</u>, 507 U.S. 725 (1993), explains why admonitions are

---

[17] <u>See</u> <u>United States</u> v. <u>Vazquez-Botet</u>, 532 F.3d 37, 56 (1st Cir. 2008) (asking whether misconduct "'so poisoned the well' that the defendant must be given a new trial." (quoting <u>Manning</u>, 23 F.3d at 574); <u>United States</u> v. <u>Laboy-Delgado</u>, 84 F.3d 22, 29 (1st Cir. 1996).

not uncommon but reversals--where no objection was made, are comparatively rare. And, if objection was made, the government can argue that it was harmless--a much tougher showing, to be sure (see note 19, below); but sometimes the impropriety is marginal and curative instructions may have lessened the impact.

Only where bad faith is shown is the need for harm sometimes disregarded.[18] But finding bad faith is not easy: trials raise the emotional level and much in closing argument is spontaneous. Further, a court may be reluctant to reverse a reliable conviction because, in Cardozo's famous phrase, "the constable has blundered." Cf. United States v. Auch, 187 F.3d 125, 133 (1st Cir. 1999) (noting Supreme Court's "admonition against letting the guilty go to punish prosecutorial misconduct.").

The present case, quite unusual, combines an undisputedly improper and significant remark, with a defense case that is forceful and well developed. The statement that "[t]hirty one potential lives were saved" can be understood (even if not so intended) as a claim that the defendants were out to kill people, which was neither the charge nor the subject of any evidence. The government concedes the remark was improper. How far other remarks

---

[18] Compare United States v. Potter, 463 F.3d 9, 22-25 (1st Cir. 2006), and United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987), with United States v. Mooney, 315 F.3d 54, 60 (1st Cir. 2002).

standing alone were improper can be and is disputed, but several of them, given the quoted statement, tended to emphasize its thrust.

Prosecutors have said worse things, but a timely objection was made so the question is whether the government can show that the remark was harmless. Very often, in a case like this one, there would be unquestioned police testimony that they caught the defendants with guns and drugs and cash, and there would be nothing from the defense side except silence. In that situation, a prosecutor's overstatement rarely looks like it had any effect; and a new trial, given such evidence, appears a waste of time.

This case is different. Six witnesses, at least four of whom had nothing specific to do with the defendants, testified that the police had fabricated the alleged seizure: that they had not taken the guns and drugs from the defendants or their vehicles, had searched the defendants but found nothing, had disappeared into the woods and returned with a bag and (according to two witnesses) had at the police station taken weapons and drugs from the bag. Other defense evidence is described in the decision.

This does not show that the defendants were bound to be acquitted. The witnesses from the housing project may have been friends of the defendants, hostile to the police or subject to intimidation. But given the objection and substantial impropriety of the main comment, the government had to show that the remark or remarks could not have affected the result, that is to say, (since

-39-

the jury's mind cannot be read), that the chances are extremely low that the outcome was affected.[19]

Here, the government cannot meet this burden. As in United States v. Azubike, 504 F.3d 30, 42 (1st Cir. 2007), where a new trial was required, "the evidence was close and the misstatement went to a central issue . . . ." Bad faith is not an issue and the defense took liberties of its own asking the jury to rely on unsupported factual claims. But in a case with a substantial defense, the prosecutor's emotional and unsupported reference to potential mass murders is enough for a new trial.

---

[19] E.g., United States v. Lizardo, 445 F.3d 73, 87-88 (1st Cir. 2006), cert. denied 549 U.S. 1007 (2006)("any possible prejudice was relatively insignificant"); See Potter, 463 F.3d at 24 (no "substantial chance--let alone a likelihood--of changing the outcome").

**HANSEN**, <u>**Circuit Judge**</u>, **concurring.** I fully concur in parts I and II of the court's opinion, and, principally for the reasons expressed in Judge Boudin's separate concurrence, I concur in the result reached in Part III. I also concur in the court's judgment.